[No. S008182. Dec. 27, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY BERRYMAN, Defendant and Appellant.

## COUNSEL

Paul M. Posner, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe, Edmund D. McMurray and Margaret Garnard Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On November 2, 1987, the District Attorney of Kern County filed an information against defendant Rodney Berryman in the superior court of that county.

Count I charged that on or about September 6, 1987, defendant murdered Florence Hildreth. (Pen. Code, § 187.) It was alleged for death eligibility that he did so under the special circumstance of felony murder in the course of rape (*id.*, § 261). (*Id.*, § 190.2, subd. (a)(17)(iii).) It was alleged for enhancement of sentence that he personally used a deadly or dangerous weapon, viz., a knife. (*Id.*, § 12022, subd. (b).)

Count II charged that on or about September 6, 1987, defendant raped Hildreth. (Pen. Code, former § 261, subd. (2), as amended by Stats. 1985, ch. 283, § 1, pp. 1307-1308, Pen. Code, present § 261, subd. (a)(2).) It was alleged for enhancement of sentence that he personally used a deadly or dangerous weapon, viz., a knife. (*Id.*, § 12022, subd. (b).)

Defendant pleaded not guilty to the charges and denied the allegations.

Trial was by jury. The panel returned a verdict of guilty as to murder and fixed the degree at the first. It found true the accompanying allegations of the felony-murder-rape special circumstance and the personal use of a deadly or dangerous weapon. It specially found that defendant killed Hildreth intentionally. It also returned a verdict of guilty as to rape. It found true the accompanying allegation of the personal use of a deadly or dangerous weapon. It subsequently returned a verdict of death for the murder. The court denied, among other motions, defendant's automatic application for modification of the verdict of death. (Pen. Code, § 190.4, subd. (e).) It proceeded to enter judgment as follows. For the murder, it imposed the sentence of death, with an additional and consecutive term of one year for personal use of a deadly or dangerous weapon. For the rape, it imposed a sentence of imprisonment comprising the upper term of eight years, with an additional and consecutive term of one year for personal use of a deadly or dangerous weapon. It stayed the sentence of imprisonment temporarily pending execution of the sentence of death and permanently thereafter. (*Id.*, § 654.) It also ordered payment of a restitution fine in the amount of $100. (Gov. Code, § 13967.)

Finding no reversible error or other defect, we conclude that the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

The People introduced evidence to the following effect.

The time relevant is September 1987; the place is the small city of Delano in rural Kern County.

Florence Hildreth resided in Delano with her mother. She was a senior at Delano High School; she was 17 years of age, 5 feet 7 inches tall, and 108 pounds in weight. She had never been married. Her nickname was "Mimi."

Defendant had recently arrived in Delano, where he had spent part of his youth, in a red, black, and gray Mitsubishi pickup truck, having come from Los Angeles County. He was apparently unemployed; he was 21 years of age, 6 feet 2 inches tall, and approximately 190 pounds in weight. He was married and had a young son; he was estranged from his wife, who remained in Los Angeles County with the child. He was a womanizer. He was staying in Delano with a "girlfriend," Crystal Armendariz, who lived at the home of her mother, Brenda Clark, and her stepfather, Martin Clark; Armendariz was Hildreth's cousin and the Clarks were her aunt and uncle. Defendant and Hildreth were acquaintances.

On September 6, 1987, defendant and Armendariz drove to Bakersfield in his pickup truck and returned to Delano sometime in the late afternoon or early evening. Apparently about 8:30 p.m., they arrived at the Clark home. They ate lasagne for dinner. Defendant then left alone. About 9 p.m., he drove a short distance to the residence of a woman named Donna Faye Warner; he attempted to "pick her up"; he was unsuccessful. About 9:20 p.m., he drove a short distance to the residence of a woman named Melinda Regina Pena; he attempted to "pick her up"; this time, he was successful. They drove to Lake Woollomes. There they stayed about 30 minutes, having sexual intercourse on the grass. On the trip back, he asked her to be his "girlfriend"; she refused, saying she already had a "boyfriend"; he became upset. Thereupon, he dropped her off outside her home.

About 10:30 p.m., Hildreth was at the house of Diane Pruitt, one of her aunts, with whose family she had planned to spend the night. At that time, she set out to walk to the Clark home to find out whether she had received a telephone call she had been expecting. She promised she would return straightway. The distance was approximately one block. About 10:34 p.m., she arrived at the Clark home. Armendariz was there. Defendant was not. Apparently, he was then about to return, or actually returning, from Pena's home, which was also located in Delano. Hildreth checked for telephone calls, and found none. About 10:45 p.m., she left to go back to Pruitt's residence. One of her uncles offered to escort her, but she declined. She never arrived at her destination.

About 11 p.m., defendant's pickup truck was seen pulling out of a convenience store onto Cecil Avenue and proceeding in a westbound direction. Two persons were observed in the vehicle. Shortly thereafter, it appears, defendant's pickup truck was seen parked on the shoulder of Cecil Avenue in the westbound direction some few miles away.

Later that night—the time is uncertain—defendant returned to the Clark home. Armendariz let him in. He was calm. He asked for something to eat. She warmed up a plate of leftover lasagne. He ate the food and eventually went to sleep. Apparently, he had drunk alcoholic beverages throughout the day but did not become intoxicated.

On the morning of September 7, 1987, Hildreth's body was found sprawled on an isolated dirt road extending south off Cecil Avenue at a right angle, about four-tenths of a mile from the location at which defendant's pickup truck had been seen parked the previous night. Before death, Hildreth had apparently been dragged to the spot and beaten about her head and body, including the right iliac or pelvic region. She was fatally stabbed in the front of her neck on the right side to a depth of about three quarters on an inch, with a nick to the carotid artery. It appears that a knife was used, and broken, in the attack. As she lay dying, her right cheek was evidently pressed down and abraded by the sole of a shoe for some appreciable period of time— apparently more than one minute and perhaps as long as three to five. When found, her body was practically nude, with the upper clothing pushed up above her chest toward her neck and the lower clothing pulled down around her left ankle; two pubic hairs rested on the left side of her head; her legs were spread apart; her right iliac or pelvic region showed abrasions; and her vagina contained blood and sperm cells—a serologist testified that a vaginal swab revealed the presence of a "very small amount of blood," the "presence of sperm cells, spermatozoa," and the presence of a "very, very small amount of semen." All the injuries were ante mortem.

At the scene of the crime were discovered distinctive shoe prints and tire tracks. The shoe prints were very similar to those of defendant's shoes. The tire tracks were very similar to those of his pickup truck. At least one of the tires in question was seen leaning, without a rim, against a fence at the Clark home about 8 a.m. on September 7; it had not been seen there on September 6. Also discovered at the crime scene was a small round yellow metal jewelry clasp that could have come from a chain that defendant owned and that was found in his pickup truck.

It was determined that the passenger-door window of defendant's pickup truck bore Hildreth's right thumbprint on its inside surface. It was also determined that the abrasion on Hildreth's right cheek displayed a pattern similar to that of the sole of defendant's right shoe. It was ascertained that the shoelace of defendant's right shoe was stained with blood that could have been deposited by only 0.068 percent of the Black population; he was not a possible donor, but Hildreth was. It was also ascertained that one of the two pubic hairs resting on the left side of Hildreth's head was consistent

with defendant's and inconsistent with hers, and that the other was consistent with hers and inconsistent with defendant's.

In statements made to friends and acquaintances on September 7, 1987, defendant revealed that Hildreth had been killed and, more specifically, that she had been killed by stabbing; he did so before that fact was generally known. He claimed that Hildreth had met her death at the hands of some unidentified persons from Los Angeles, and said that he wanted a gun to pay them back. He also claimed that a scratch that marked his face resulted from a game of basketball earlier in the day. Overhearing a comment that his pickup truck had been seen on Cecil Avenue sometime the previous night, he immediately denied the fact, stating that "it wasn't his truck" and that "he was at a girl's house the whole time." He telephoned a "girl" he called "Connie" and "tr[ied] to make [her] say that he was there the whole time"—evidently without success.

In statements made to investigating law enforcement officers later on September 7, 1987, defendant denied that he or his pickup truck had been on Cecil Avenue at any time the night before. He also denied that Hildreth had ever been in his vehicle. He said that the scratch on his face resulted from a game of basketball earlier in the day.

For his part, defendant introduced evidence to undermine the probativeness of the People's evidence, in an effort to show that they had not carried their burden. He played on various uncertainties, including uncertainties related to time. He did not take the stand.

B. *Penalty Phase*

In aggravation, the People introduced evidence of other violent criminal activity in which defendant had engaged and prior felony convictions that he had suffered.

Specifically, there was a stipulation that defendant was convicted in the Superior Court of Los Angeles County of three counts of transportation of marijuana (Health & Saf. Code, § 11360, subd. (a)) in March 1984, and one count of grand theft (Pen. Code, former § 487, subd. (1), as amended by Stats. 1982, ch. 375, § 1, p. 1693, Pen. Code, present § 487, subd. (1)) in August 1984.

There was also testimony that defendant had committed assault (Pen. Code, § 240) and/or assault with a deadly weapon (*id.*, § 245) in two separate incidents.

David Edmund Perez testified that on July 19, 1987, he was involved in a traffic altercation in Los Angeles County with a number of other men, including defendant; in its course, defendant "came up from behind me with a tire iron and hit me in the back of the head," causing a wound that later required 10 stitches to close; "after he hit me and tried to hit me again and I blocked it, the second one, he started chasing me, and him and his buddy were yelling out L A Cr[i]ps"—an apparent reference to a notorious street gang. It appears that defendant was arrested and charged with respect to the attack on Perez, but subsequently fled.

Howard Dean Fuller, who was the father of defendant's wife, testified that in early August 1987 at his home in Los Angeles County, he and defendant engaged in a dispute about family matters: ". . . Rodney came to the door, came into the yard, and I had told him several times not to come to the house, period, and I told him that he couldn't come in"; "[h]e continued to come in, I told him no, and I stood in his way, and we began to push backwards and forth"; and "he hit me" on the "bridge of the nose."

In mitigation, defendant introduced evidence relating to his background and character.

Family members and friends testified to the following effect:

In 1965, defendant was born in Cheyenne, Wyoming; his father and mother had an older son and would have a younger daughter and son; at the time of defendant's birth, his father was serving in the Air Force. Defendant's childhood and adolescence were troubled. His parents' marriage was stormy, marked by physical violence by his father against his mother, and punctuated with a number of separations before an eventual divorce. He moved back and forth among his father and mother and others in various locations, including Delano; he was not given adequate attention and affection; he did poorly in school.

During his teenage years, defendant became a "Casanova"; he began to abuse alcohol, run away, and get in trouble with the law; his father died; and he started to experience recurrent disabling headaches, which were apparently connected (at least in part) to a work-related injury to his head.

In May 1986, defendant married his wife, Carol Lynn Berryman, née Fuller. They set up house together in Los Angeles County, and participated in activities at Carol's father's church. In August 1986, Carol gave birth to a son, Rodney, Jr. Defendant attempted to discharge his responsibilities as husband and father, providing for his wife and son and showing them

affection. Before long, however, he began to falter. There were problems in his personal life, marriage, and employment, which exacerbated, and were exacerbated by, his abuse of alcohol. By June 1987, he began a precipitous downward spiral. He seems to have recognized his difficulties with alcohol, but could not, or simply did not, bring them under control. Soon, he and his wife separated. In August 1987, he went to Delano, in part at least to avoid the legal consequences of his attack on Perez. On or about September 6, 1987, Hildreth was raped and murdered.

In the opinion of family members and friends, defendant was "warm," "caring," and "nice"; he had been, and remained, close to those who loved him and whom he loved; he was not violent, either generally or specifically in his dealings with women. His wife continued to "love him very much."

William D. Pierce, Ph.D., a clinical psychologist, testified as an expert witness in relevant part as follows. His "axis one" diagnosis of defendant—which "refers to the type of symptomatology or problems that you feel the person is experiencing like right now, or that are most important"—was "alcohol induced organic disorder, alcohol intoxication and rule out organic mental syndrome, not otherwise specified." He had discovered certain "soft signs" of "organicity," but could not "confirm or disconfirm" its presence because he was unable to obtain specified neurological testing. His "axis two" diagnosis—which "refers to long-standing kind of personality traits or characteristics that have been occurring over a longer period of time"—was "personality disorder, not otherwise specified, with dependent narcissistic and depressive features." He opined, in substance, that the rape and murder of Hildreth was "uncharacteristic" of defendant, and his conduct in the incident was "bizarre" and "out of control." He admitted that there was "no serious psychological disorder"—neither "psychosis" nor "neurosis"—but simply "evidence of ongoing personality and interpersonal problems."

Samuel George Benson, Jr., M.D., a psychiatrist, gave testimony as an expert witness that generally followed that of Dr. Pierce. He "confirmed" the "soft signs of organicity" found by Dr. Pierce. He proceeded to opine that defendant "does, in fact, suffer from an organic mental syndrome, that it's probably alcohol induced, but there is [sic] some other factors in addition to his consumption of alcohol that's [led] to it," including "head trauma." He stated that his "diagnosis" included "middle brain dysfunction." He added: "Increasingly more important in trying to understand and care for people from a medical point of view, it is necessary to know about their lifestyle." "In evaluating Rodney, Mr. Berryman, what I really noted and I thought was very important about his lifestyle was a kind of constant seeking for—to be taken care of, a kind of dependency, particularly on women, and almost

exclusively on women, of becoming very close, to get nurturing by being charming, kind, somewhat immature, but constantly needing numbers, more than the average, more than most people, of women, so that he feels as though he's loved, so he feels as though he can somehow be taken care of."

Defendant also introduced evidence concerning incarceration in state prison and infliction of death by lethal gas.

Defendant did not take the stand.

## II. GUILT ISSUES

Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.

### A. *Denial of Motion to Substitute Attorneys*

On September 11, 1987, Charles J. Soria was appointed as counsel to defendant. On April 6, 1988, George W. Peterson was appointed cocounsel.

On December 15, 1987—after Soria's appointment but before Peterson's —defendant orally moved the court to relieve Soria and appoint new counsel in his place: "I would like another attorney appointed to me . . . . Because I don't feel comfortable with the attorney that I have." The court responded: "Well, you don't have a right to be comfortable with him, sir." Defendant: ". . . I feel I have a right to change lawyers if I want to. I don't feel comfortable with the man. [¶] And I'm looking at the death penalty and he's going to tell me that I don't have the right to change lawyers?" The court: "That's exactly what I'm telling you. If it's simply a matter of being comfortable with him." Defendant: "There is a reason why I don't feel comfortable with him." The court set a hearing for December 17 pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], in order to afford defendant an opportunity to state his reason.

On December 17, 1987, the court held a hearing in camera on defendant's motion, with only defendant, Soria, and court personnel present.

The court inquired as to the grounds of the motion. Defendant stated: "[D]uring our preliminary hearing I asked him to bring a witness in for me and he didn't. He failed to do that. He gave me some excuse I really can't remember." The court determined that this ground was insufficient: "[T]actically it is generally an accepted practice for the defense not to put on any evidence at the time of the preliminary hearing."

The court continued its inquiry. Defendant stated: "He's talking about my case to other inmates in the jail. One inmate told me that he said he feels that I've done this crime and the reason why he's holding onto this case is because he has to. Like—you know, like he's not determined to win this case or fight it, just had to do it." Allowed to respond, Soria said that he had indeed asked "other inmates how Mr. Berryman was doing," but had "never said to any inmate that I believe that Mr. Berryman has done this." The court impliedly determined that this ground was unsupported.

The court went on with its inquiry. Defendant stated: "He's holding conversations with Lisa Green"—who was the deputy district attorney then assigned to the case. "And I think that these two have something going on together that's—instead of him defending me, trying to convict me with her."

Soria volunteered an explanation for the various acts and omissions of which defendant complained. He then commented: "He has not liked me from the start. Maybe it's because he's—even though he is born and raised in Delano, for some extent, the last few years of his life, he's been in Los Angeles. His people are in Los Angeles. They desperately wish to have a Los Angeles attorney or someone from down there. They don't have the money." "In this case I will [need his cooperation]. And if he's not going to place his confidence in me—the trial is set May 2nd. There's adequate enough time for new counsel. I don't know if Mr. Berryman will have the same disagreements with new counsel, but I don't believe our relationship is ever going to get any better. And I'll leave it up to the Court."

The court determined that this ground was unsupported as well: "We have appointed counsel to represent you, Mr. Berryman. . . . I have seen nothing that you've offered today that indicates that Mr. Soria is doing anything short of a journeyman job for you. [¶] I'm confident that your suspicions not only are not well founded based on what you've told me, but my experience with both Mrs. Green and Mr. Soria is there certainly is no underlying conspiracy between them that is working to your disadvantage and no underlying conspiracy between them in any way."

Thereupon, the court denied defendant's motion. "You've not shown grounds that would justify me granting that motion. [¶] I will urge you to cooperate with Mr. Soria in the preparation of your defense. Your failure to cooperate with him will only be to your undoing and not to Mr. Soria's. And if you do fail to cooperate with him that is an unfortunate situation that you may find yourself in later on. [¶] But it's not the doing of Mr. Soria and certainly not the doing of the Court. And it's inappropriate simply for

whatever reason to keep changing attorneys until you find one that you feel that you like. . . . Your motion will be denied."

■ Defendant contends that the court erred by denying his motion to relieve Soria and appoint new counsel in his place. The applicable standard of review is abuse of discretion. (See, e.g., *People* v. *Marsden, supra*, 2 Cal.3d at p. 123.) No abuse appears. It was not at all unreasonable for the court to decline defendant's request for substitution: it determined—soundly, in our view—that each of the grounds on which he relied was either insufficient or unsupported. Certainly, it was not required to appoint an attorney whom defendant might like.

Defendant argues to the contrary. He fails to establish the merit of his position.

To be sure, a defendant may be entitled to an order substituting appointed counsel if he shows that, in its absence, his Sixth Amendment right to the assistance of counsel would be denied or substantially impaired. (See, e.g., *People* v. *Marsden, supra*, 2 Cal.3d at p. 123.)

Defendant did not make the requisite showing in his motion. Notwithstanding his present assertion, he and Soria were *not* "embroiled in [such an] irreconcilable conflict" that ineffective assistance of counsel in violation of the Sixth Amendment was likely to result. True, defendant claimed a "lack of trust in, or inability to get along with," Soria. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 860 [251 Cal.Rptr. 227, 760 P.2d 423] (lead opn. by Kaufman, J.).) That was not enough. "[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*Ibid.*) Defendant maintains that Soria admitted an "irreconcilable conflict" of the kind that compels substitution. That is not the case. Indeed, Soria stated: "I agree with the Court there are probably no grounds before it to rule" in defendant's favor.

■ Defendant may not attempt to make up for what was lacking in his motion by relying on matters subsequent to its denial. A reviewing court "focuses on the ruling itself and the record on which it was made. It does not look to subsequent matters . . . ." (*People* v. *Douglas* (1990) 50 Cal.3d 468, 542 [268 Cal.Rptr. 126, 788 P.2d 640] (conc. opn. of Mosk, J.).) In any event, the matters on which defendant relies are without significance for present purposes. To the extent that he may be understood to assert that the

court erred by denying a similar motion he made on May 5, 1988, he is not persuasive.[1]

B. *Evidence Concerning the Compensation of a Defense Expert*

In his case-in-chief, defendant called as an expert witness Stephan A. Schliebe, a criminalist. On cross-examination, the prosecutor sought to inquire into his compensation—specifically, the amount. Defense counsel objected to the admissibility of such evidence on the basis of provisions including Penal Code section 987.9 and its "confidentiality requirement." The court overruled the objection. On the prosecutor's inquiry, Schliebe testified in substance that his firm had already billed about $2,500 for his services and would bill about $1,300 in addition.

In relevant part, Penal Code section 987.9 provides: "In the trial of a capital case," among others, "the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. . . . *The fact that an application has been made shall be confidential and the contents of the application shall be confidential.* Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing." (Italics added.)

■ Defendant contends that the court erred by overruling his Penal Code section 987.9 objection to the admissibility of evidence of Schliebe's compensation and subsequently allowing the testimony in question. We disagree. Evidence Code section 722, subdivision (b), declares that the "compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony." We do not read Penal Code section 987.9 to carve out an exception when the expert witness happens to be paid under its provisions. "The confidentiality requirement was evidently intended to prevent the prosecution from learning of the application for funds and thereby improperly anticipating the accused's defense." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1132 [240 Cal.Rptr. 585, 742 P.2d 1306].) Such a result was not threatened here.

---

[1]Defendant claims in substance that the asserted error in denying his motion amounts, at least in this case, to error violative of, inter alia, the Sixth and Fourteenth Amendments to the United States Constitution. There was no error.

## C. *Prosecutorial Misconduct as to Guilt*

Defendant contends that on numerous occasions before the jury the prosecutor engaged in misconduct as to guilt.

■ "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) His "good faith *vel non*" is not "crucial." (*People* v. *Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802 P.2d 330].) That is because the standard in accordance with which his conduct is evaluated is objective.

■ " 'It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion'— and on the same ground—'he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 976 [2 Cal.Rptr.2d 112, 820 P.2d 214], quoting *People* v. *Benson, supra,* 52 Cal.3d at p. 794.)

After review, we reject defendant's claim at the threshold. He failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to any of the comments by the prosecutor of which he now complains. No exception is applicable.

■ We also reject defendant's claim on the merits. When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) On this record, the answer is no. We do not overlook some apparent misstatements and other infelicities by the prosecutor. But when we consider each of the challenged comments in its context, we simply cannot conclude that the prosecutor used a method to persuade the jury that was "deceptive" or "reprehensible."

■ Let us consider as representative examples the three complaints to which defendant devotes the greatest number of pages in his briefing.

In the course of his summation, the prosecutor sought to elucidate for the jury certain aspects of the court's charge. The court had already instructed the jury that it could find defendant not guilty of murder but guilty of the lesser included offense of voluntary manslaughter. The court would soon declare that the jury could return partial verdicts, and related findings, as to homicide, including first degree murder, second degree murder, and voluntary manslaughter. And the court would soon explain how the jury was to

complete the forms for the possible verdicts and findings. In commenting on the foregoing, the prosecutor evidently used a demonstrative aid in the form of a chart "to make sure that all of you understand . . . how you would work down this ladder of lesser included offenses."

Following our decision in *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809] (hereafter sometimes *Stone*), we held in *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 324-325 [250 Cal.Rptr. 244, 758 P.2d 572] (hereafter sometimes *Kurtzman*), that a court may "restrict[] a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense" but may not "preclude [it] from *considering* lesser offenses during its deliberations." (Italics in original.) We thereby impliedly rejected a "strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses." (*Id.* at p. 333.)

Defendant claims to discern misconduct in a number of comments by the prosecutor that arguably suggested, contrary to *Stone* and *Kurtzman*, that the jury was required to deliberate on the charges and allegations in a specified order. We do not. At most, the prosecutor's remarks may have amounted to a misstatement of the law. Even if "erroneous, however, they cannot be characterized as misconduct. '[A] prosecutor is not guilty of misconduct because in his argument of the law to the jury, he is wrong as to the law. . . .'" (*People* v. *Bonin* (1988) 46 Cal.3d 659, 702 [250 Cal.Rptr. 687, 758 P.2d 1217].)[2]

■ Next, in the course of his summation, the prosecutor set out to explicate for the jury the People's burden of proof beyond a reasonable doubt, on which the court had already given an instruction.[3]

---

[2]In the course of these comments, the prosecutor misspoke himself by implying that acquittal depended on proof beyond a reasonable doubt of innocence. He effectively corrected himself after the court brought the matter to his attention.

[3]In a supplemental brief filed practically on the eve of oral argument, defendant raised for the first time the contention that the court erred under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by instructing the jury as it did on the People's burden of proof beyond a reasonable doubt, with specific regard to the definition of "reasonable doubt." He argues that the instruction "allow[ed] a finding of guilt based on a degree of proof below that required by the [Fourteenth Amendment's] Due Process Clause," i.e., proof beyond a reasonable doubt. (*Cage* v. *Louisiana* (1990) 498 U.S. 39, 41 [112 L.Ed.2d 339, 342, 111 S.Ct. 328] (*per curiam*).)

When we consider a claim of this sort, the question we ask is whether there is a reasonable likelihood that the jury construed or applied the challenged instruction in an objectionable fashion. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663.)

On this record—and notwithstanding any asserted infirmity in the underlying standard instruction itself (CALJIC No. 2.90 (1979 rev.) (4th ed. 1979)—the answer is negative. There

". . . I'd like to discuss that a little more, what the burden of proof is, what it means, and how you're to go about proving—discharging that burden of proof.

". . . . . . . . . . . . . . . . . . . . . . . . . .

". . . [T]his particular burden is substantial. There is no doubt about that, because we all take the life and liberty of our fellow citizens, our fellow occupants of this country, whether or not they're citizens, very seriously.

"We want to make sure that before we deprive a person of their liberty, we have thoroughly examined those issues. And whether the evidence that has been presented persuades us that a law has been broken.[4]

". . . . . . . . . . . . . . . . . . . . . . . . . .

"For that reason, I have the burden of proving beyond a reasonable doubt, and in the instruction it says not beyond a possible or imaginary doubt, because everything relating to human affairs is open to some possible or imaginary doubt.

"But it is that state of the case which after the comparison and consideration, comparison and consideration, of all the evidence, leaves the minds of the jurors that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

"It's not absolute knowledge. We're not going to—we haven't replayed any instant replays in this particular case.

"However, I would suggest to you that the photographs in this case are so graphic and so convincing, that they, themselves, are sufficient for you to return a verdict of guilty.[5] You can see for yourself what occurred there.

"There's evidence on the ground and upon the person of Mimi Hildreth, as to what happened.

is no reasonable likelihood that the jury misconstrued or misapplied the instruction in question as defendant argues.

[4]Defendant claims that the sentence to which this footnote is appended amounts to misconduct in and of itself. It does not. There is simply no reasonable likelihood that the jury construed or applied the words in an objectionable fashion.

[5]Defendant claims that the sentence to which this footnote is appended amounts to misconduct in and of itself. It does not. There is simply no reasonable likelihood that the jury construed or applied the words in an objectionable fashion.

"So the question that's been presented to you, and if you'll recall, one of the Judge's instructions to you . . . , what questions we have for the jurors to make the decision, do you feel that he raped and murdered Mimi.

"Will that feeling stay with you? And is that feeling based upon moral evidence produced in this courtroom?

". . . . . . . . . . . . . . . . . . . . .

"Do you feel that he did it, and is your feeling based upon evidence that's produced here in court. Now, if your feeling would be based upon well, gee, he also reminds me of the little kid that used to throw my newspapers on to the roof and gave me a smart answer when I asked him to get it on the porch, or some other ridiculous thing like that.

"I don't suggest that any of you would have those feelings, but if you have a feeling that he didn't do it, what is that feeling based upon?

"Is that feeling also based upon evidence that's produced here in court?

"Unless it's a reasonable interpretation of evidence that's produced here in court, it's not proper for you to take into consideration at all.

"And even if it was, it would only have to do with an element of the offense, because all I have to prove in this case are the elements of the offense, plus the identity."

Defendant claims to discern misconduct in the comments by the prosecutor referring to "feel," "feeling," and "feelings." We do not. Defendant argues that, by using the words quoted above, "[t]he prosecutor lessened his burden of proof and appealed to the passions of the jurors . . . ." There is simply no reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.

■ Last, in the course of his summation, the prosecutor stated that "[t]o return a verdict on the first degree intentional premeditated and deliberate killing, there would be [several] elements to be proved," one of which was that a "human being was killed. . . . Well, it seems like well, that obvious. But you do have in some cases, well, it wasn't really a human being that was killed. [¶] They try to place the victim outside of the pale of humanity, as it was, that person did something wrong, it was a bad person, he or she deserved this. We didn't have that in this particular case. No one could say

a bad word against Mimi. If they could have, they would have been here on the stand. [¶] That is a 17 year old girl, looking forward to her senior year, and just an absolute gem, and no one can say she deserved to die."

Defendant claims to discern misconduct in the comments by the prosecutor quoted above. We do not. Defendant argues that the prosecutor's remarks to the effect that Hildreth was "just an absolute gem" were "unsupported by the record . . . ." That is not the case. The words in question constitute a reasonable inference from, and fair comment on, the evidence adduced at trial. Defendant also argues that the prosecutor's remarks "falsely attribut-[ed] to the defense a claim that [Hildreth] deserved to die because she was not a human being." (Underscoring omitted.) That is also not the case. There is no reasonable likelihood that the jury so construed or applied the words under review. A reasonable juror would have understood and employed the language for what it was, i.e., a reasonable inference from, and fair comment on, the evidence.[6]

### D. Instructions on Lesser Included Offense and Partial Verdicts as to Homicide

As noted above (see pt. II.C., *ante*), the court instructed that the jury could find defendant not guilty of murder but guilty of the lesser included offense of voluntary manslaughter. It also declared that it could return partial verdicts, and related findings, as to homicide, including first degree murder, second degree murder, and voluntary manslaughter. Finally, it explained how it was to complete the forms for the possible verdicts and findings.

As also noted above (see pt. II.C., *ante*), we held in *People* v. *Kurtzman, supra,* 46 Cal.3d 322, after our decision in *Stone* v. *Superior Court, supra,* 31 Cal.3d 503, that a court may "restrict[ ] a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense" but may not "preclude [it] from *considering* lesser offenses during its deliberations." (*People* v. *Kurtzman, supra,* 46 Cal.3d at pp. 324-325, italics in original.) We thereby impliedly rejected a "strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses." (*Id.* at p. 333.)

---

[6]Defendant claims in substance that the asserted prosecutorial misconduct bearing on guilt requires reversal under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. There was no misconduct. Certainly, the complained-of comments by the prosecutor did not " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden* v. *Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157, 106 S.Ct. 2464].)

■ Defendant contends that by instructing the jury as it did, the court erred under *Stone* and *Kurtzman*: it effectively imposed, he asserts, an acquittal-first rule. We disagree.

On this record, there is no reasonable likelihood that the jury construed or applied the challenged instructions in a manner offensive to *Stone* and *Kurtzman*. We do not overlook certain language in the instructions themselves that arguably suggested that the jury was required to deliberate on the charges and allegations in a specified order. Neither do we overlook a number of comments in the prosecutor's summation, referred to above (see pt. II.C., *ante*), to similar effect. Nevertheless, we believe that a reasonable juror would have understood and employed the instructions—which he or she was directed to consider as a whole and in context—simply to govern how the jury was to return its verdicts and findings after it completed its deliberations on the charges and allegations. This is because, in accordance with their very terms, the instructions spoke much of returning verdicts and findings and little of deliberating on the charges and allegations.[7]

---

[7]Defendant claims in substance that the asserted instructional error under *Stone* and *Kurtzman* amounts, at least in this case, to error violative of, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. There was no error, however, under *Stone* and *Kurtzman*.

We recognize that in *Kurtzman* we broadly stated that instructions like those under challenge here "may confuse jurors . . . as to how deliberations should proceed," "may create ambiguity as to just what is prohibited and what is required," and are "potentially misleading." (*People v. Kurtzman, supra*, 46 Cal.3d at p. 336.) "Whatever its validity in the abstract, that statement does not affect our view as to how a reasonable juror would have . . . understood [or employed] the instructions actually given in this case." (*People v. Mickey* (1991) 54 Cal.3d 612, 673, fn. 10 [286 Cal.Rptr. 801, 818 P.2d 84] [rejecting a claim of error against similar instructions on a similar record].)

Whether and when an erroneous instruction imposing an acquittal-first rule would be reversible is a difficult question.

Error of this sort appears to implicate California law only. "It is the general rule for error under state law that reversal requires prejudice and prejudice in turn requires a reasonable probability of an effect on the outcome." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1253 [270 Cal.Rptr. 451, 792 P.2d 251].) That rule seems applicable here.

In the abstract, an acquittal-first instruction appears capable of *either* helping *or* harming *either* the People *or* the defendant.

Such an instruction "has the merit, from the Government's standpoint, of tending to avoid the danger that the jury will not adequately discharge its duties with respect to the greater offense, and instead will move too quickly to the lesser one. From the defendant's standpoint, it may prevent any conviction at all; a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree. But it entails disadvantages to both sides as well: By insisting on unanimity with respect to acquittal on the greater charge before the jury can move to the lesser, it may prevent the Government from obtaining a conviction on the lesser charge that would otherwise have been forthcoming and thus require the expense of a retrial. It also presents dangers to the defendant. If the jury is heavily for conviction on the greater offense, dissenters favoring the

### E. *Instruction on Implied Malice Aforethought*

The court instructed the jury on the definition of murder, in relevant part, as follows: "The crime of murder is the unlawful killing of a human being with malice aforethought . . . ."

The court further instructed the jury on the definition of malice aforethought, including the following: " 'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life or when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (Brackets omitted.)

■ Defendant contends that the court erred by instructing the jury as it did on implied malice. He argues that the instruction in question established a "mandatory presumption" of implied malice that relieved the People of their burden of proof beyond a reasonable doubt on that element and thereby violated the due process clause of the Fourteenth Amendment to the United States Constitution.

We reject the claim. There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction as a "mandatory presumption" of implied malice, less still as one that reduced the People's burden of persuasion in any way. Indeed, a reasonable juror would have understood and employed the instruction in accordance with what it purported to be, to wit, a *definition* of implied malice—a definition, we may note, that is adequate (see *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1221, fn. 1 [264 Cal.Rptr. 841, 783 P.2d 200] [finding "no error in the giving of" a substantially identical instruction]).

lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge." (*United States* v. *Tsanas* (2d Cir. 1978) 572 F.2d 340, 346, fn. omitted (per Friendly, J.).)

As stated, in the abstract, an acquittal-first instruction appears capable of either helping or harming either the People or the defendant. In any given case, however, it will likely be a matter of pure conjecture whether the instruction had any effect, whom it affected, and what the effect was. Certainly, even if we could conclude that there is a reasonable likelihood that the jury in this case construed or applied the challenged instructions as imposing an acquittal-first rule, on this record we could not conclude that defendant suffered prejudice.

F. *Refusal of "Special" Instructions Requested by Defendant*

Defendant requested the court to give the jury the following instructions, among others: (1) "Special Instruction No. 'A'," which declared to the effect that first degree felony-murder-rape requires the perpetrator to form a specific intent to rape either prior to or during the commission of the fatal act; (2) "Special Instruction No. 'B'," which stated in part that rape must involve a live victim and "not a dead body"; and (3) "Special Instruction No. 'E'," which would have told the jury, in language derived from *People* v. *Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942], that "[b]efore you may find that the killing in this case was deliberate and premeditated, you must find evidence of planning activity, motive to kill, and a calculated killing; or extremely strong evidence of planning activity; or evidence of a motive to kill, in conjunction with either planning activity or a calculated killing," etc.

The court refused each of the three "special" instructions. In substance, its reasoning (at least in part) was this: to the extent that it was legally correct, each of the instructions was duplicative of one or more other instructions that it intended to give.

The court subsequently gave each of its intended standard instructions.

 Defendant contends that the court erred by refusing each of the three "special" instructions.

 Of course, it is not erroneous to refuse an instruction that is not legally correct. (See *People* v. *Benson, supra,* 52 Cal.3d at p. 799.) Indeed, it would be improper not to. (See *ibid.*) Further, "[i]t is not erroneous to refuse" even a legally correct instruction if it is duplicative. (*Id.* at p. 805, fn. 12.)

 There was no error in the court's refusal of any of the three "special" instructions. The question of the appropriate standard of review need not be addressed. Even if examined de novo, the court's determination is sound.

To be sure, it is clear that "Special Instruction No. 'A' " is legally correct at least in part. " '[I]n order to establish a defendant's guilt of first degree murder on the theory that he committed the killing during the perpetration . . . of one of the enumerated felonies . . . , the prosecution must prove that he harbored the specific intent to commit one of such enumerated felonies.' [Citation.] Additionally, the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of

the acts which resulted in the victim's death . . . ." (*People* v. *Anderson*, *supra*, 70 Cal.2d at p. 34.)

Similarly, it is clear that "Special Instruction No. 'B' " is legally correct at least in part. Rape "must involve a live victim . . . ." (*People* v. *Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

By contrast, it is doubtful whether "Special Instruction No. 'E' " is legally correct in any part. By its very terms, *People* v. *Anderson*, *supra*, 70 Cal.2d 15, guides appellate courts in conducting sufficiency-of-evidence review of findings by juries of premeditation and deliberation. (See *id.* at pp. 24-34.) It does not even purport to constrain juries in making such findings.

Nevertheless, to the extent that it was legally correct, each of the three "special" instructions was indeed duplicative. Each was adequately covered by one or more of the standard instructions actually given. There is no reasonable likelihood that the jury construed or applied the latter so as not to embrace the substance of the former.[8]

G. *Omission of an Instruction on Involuntary Manslaughter*

 Manslaughter is deemed to be related to murder as a lesser included offense. (See, e.g., 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 327, p. 379; compare Pen. Code, § 187, subd. (a) [defining murder as the "unlawful killing of a human being . . . with malice aforethought"] with *id.*, § 192 [defining manslaughter as the "unlawful killing of a human being without malice"].) As relevant here, manslaughter is voluntary, i.e., "upon a sudden quarrel or heat of passion" (*id.*, § 192, subd. (a)), or involuntary, i.e., "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" (*id.*, § 192, subd. (b)).

The court instructed the jury on murder. It also instructed on voluntary manslaughter as a lesser included offense. Defendant had so requested. By contrast, it did not instruct on involuntary manslaughter as a lesser included offense. Defendant had not so requested. In discussing proposed instructions, defense counsel Soria had stated: "I don't think this is an involuntary [manslaughter] situation."

 Defendant contends that the court erred by failing to instruct the jury sua sponte on involuntary manslaughter as a lesser included offense.

---

[8]Defendant claims in effect that the asserted instructional error amounts, at least in this case, to error violative of, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. There was no error.

There was no error. A court is not obligated to instruct sua sponte on involuntary manslaughter as a lesser included offense unless there is substantial evidence, i.e., evidence from which a rational trier of fact could find beyond a reasonable doubt (see *People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311]) that the defendant killed his victim "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" (Pen. Code, § 192, subd. (b)). Such evidence is lacking here. To be sure, one might speculate that defendant killed Hildreth as he perpetrated some unspecified misdemeanor or performed some unspecified act with criminal negligence. But speculation is not evidence, less still substantial evidence. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Any error, however, would not have required reversal. Indeed, it would "necessarily [have been] harmless in light of the jury's special circumstance finding that defendant killed [Hildreth] in the perpetration of [rape]. Under this finding, the [Hildreth] killing was necessarily felony murder." (*People* v. *Price, supra,* 1 Cal.4th at p. 464.)[9]

## H. *Ineffective Assistance of Counsel as to Guilt*

Defendant contends that defense counsel provided him with ineffective assistance as to guilt in violation of the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution.

To succeed under the Sixth Amendment or article I, section 15, a defendant must show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability of an adverse effect on the outcome. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both the federal and state constitutional rights to the assistance of counsel].)[10]

The prosecutor called many witnesses and used many exhibits to prove defendant's guilt beyond a reasonable doubt. For their part, defense counsel

---

[9]Defendant may be understood to claim that the asserted instructional error amounts, at least in this case, to error violative of, inter alia, the Eighth and Fourteenth Amendments to the United States Constitution. There was no error. And, if there were, it would not implicate the federal charter.

[10]To the extent that defendant argues that the showing required under the Sixth Amendment or article I, section 15 is different from that stated in the text, he is unpersuasive. He relies on language in various older decisions suggesting that prejudice may be shown under a test of reasonable *possibility*. (See, e.g., *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] [discussing both the federal and state constitutional rights to the assistance of counsel].) Those words, however, are no longer vital. (See, e.g., *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 217-218 [same].)

called several witnesses and used several exhibits to raise such a doubt, playing on various uncertainties in the prosecutor's evidence, including uncertainties related to time.

Defendant claims that defense counsel performed deficiently with regard to numerous cited acts and omissions and thereby subjected him to prejudice. In large part, he simply recasts arguments for reversal that we have expressly or impliedly disposed of in the course of the preceding analysis. He is indeed forceful in presenting his complaints. We have carefully considered each in its proper context. In few, if any, instances does he show professionally unreasonable conduct. In none does he show a reasonable probability of an adverse effect on the outcome.

For example, defendant does not establish ineffective assistance in defense counsel's asserted failure to more fully prepare criminalist Schliebe for his testimony. He does not demonstrate that fuller preparation would have yielded favorable results. Hence, he cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.

Neither does defendant establish ineffective assistance in defense counsel's asserted failure to investigate his mental state at the time of the crime or to introduce evidence thereon. Here as well, he does not demonstrate that the investigation would have yielded favorable results and hence cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.[11]

## I. Sufficiency of the Evidence for the Convictions

 Defendant contends in substance that the evidence is insufficient under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution to support his convictions for rape and first degree murder.

---

[11]Defendant appears to claim constructive denial of counsel bearing on guilt: defense counsel's assertedly deficient performance "resulted in a breakdown of the adversarial process at trial; that breakdown establishes a violation of defendant's federal and state constitutional right to the effective assistance of counsel; and that violation mandates reversal of the judgment even in the absence of a showing of specific prejudice." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 84 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.).) The point is without merit.

Defendant may be understood to claim that defense counsel's ineffective assistance under the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution bearing on guilt entails the violation of other provisions of the federal and state charters, including the Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17. There was, however, no ineffective assistance.

■ In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment and/or the due process clause of article I, section 15, the "question we ask is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime'"—and the identity of the criminal—"'beyond a reasonable doubt.'" (*People* v. *Rowland, supra,* 4 Cal.4th at p. 269, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.)

■ Defendant claims that the evidence is insufficient to support either his rape or first degree murder conviction on the ground that it is inadequate to identify him as the perpetrator.

In view of the evidence described above (see pt. I.A., *ante*), a rational trier of fact could surely have found beyond a reasonable doubt that defendant was in fact the perpetrator. One need only recall the evidence relating to defendant's pickup truck, its tires, and the tire tracks; defendant's shoes and the shoe prints; defendant's jewelry clasp; the abrasion on Hildreth's right cheek displaying a pattern similar to that of the sole of defendant's right shoe; the stain on the shoelace of defendant's right shoe apparently produced by Hildreth's blood; defendant's and Hildreth's pubic hairs found on the latter's body; Hildreth's right thumbprint on the inside surface of the passenger-door window of defendant's pickup truck; and defendant's self-incriminating statements to friends and acquaintances and to investigating law enforcement officers.

Defendant argues to the contrary. To be sure, the inculpatory evidence is not without weaknesses in certain particulars, including the matter of time. But considered as a whole, it is altogether substantial. Defendant establishes nothing more than that some rational trier of fact might perhaps have declined to identify him as the perpetrator. That is not enough.

■ Defendant separately claims that the evidence is insufficient to support his rape conviction. In particular, he argues that evidence is lacking that he engaged in sexual intercourse with Hildreth, and specifically that he accomplished penetration; that he did so without her consent; and that he did so while she was alive.

As charged here, "[r]ape is an act of sexual intercourse . . . with a person not the spouse of the perpetrator" "accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another." (Pen. Code, former § 261, subd. (2), as amended by Stats. 1985, ch. 283, § 1, pp. 1307-1308; accord, Pen. Code, present § 261,

subd. (a)(2); cf. *id.*, § 262, subd. (a) [rape of spouse].) "Any sexual penetration, however slight, is sufficient to complete the crime." *(Id.*, § 263.)

Thus, for rape there must be, inter alia, an act of sexual intercourse with at least some penetration, "involv[ing] a live victim [citation] who does not effectively consent [citation]." *(People* v. *Rowland, supra,* 4 Cal.4th at p. 269.)

In view of the evidence described above, a rational trier of fact could certainly have found beyond a reasonable doubt that defendant raped Hildreth. As to sexual intercourse with at least some penetration: Hildreth's vagina contained sperm cells. As to lack of consent: Hildreth's upper clothing had been pushed up above her chest toward her neck and the lower clothing had been pulled down around her left ankle; her right iliac or pelvic region had been abraded; and her vagina contained blood cells. As to vitality: all the injuries on Hildreth's body were ante mortem.

Defendant's contrary argument again proves too little, establishing nothing more than that some rational trier of fact might perhaps have declined to find him guilty of rape. Notwithstanding his implication, the "absence of genital trauma is not inconsistent with nonconsensual sexual intercourse." *(People* v. *Rowland, supra,* 4 Cal.4th at p. 265.) And notwithstanding his assertion, in his summation the prosecutor did not concede lack of penetration. Defendant attempts to deny the existence of evidence that Hildreth's vagina contained sperm cells. He cannot succeed. As noted, a serologist testified that a vaginal swab revealed the "presence of sperm cells, spermatozoa." That he also testified that the swab revealed the presence of only a "very, very small amount of semen" is without consequence here—especially in light of the fact that defendant had apparently ejaculated not long before the rape when he engaged in sexual intercourse with Pena. One point deserves special comment. Relying on the evidence referred to in the preceding paragraph and also on the fact that Hildreth's legs were spread apart in death, a rational trier of fact could have rejected, beyond a reasonable doubt, the following scenario that defendant suggests, to wit, that he engaged in consensual sexual intercourse *and only thereafter* turned to violence: such a trier could have concluded to the requisite degree of certainty that violence accompanied sex.

 Finally, defendant claims that the evidence is insufficient to support his first degree murder conviction.

The People prosecuted the case on two theories of first degree murder. The primary was felony-murder-rape. The secondary was willful, deliberate,

and premeditated murder. In his summation, the prosecutor all but expressly withdrew the latter.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)

As pertinent here, "[a]ll murder which is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree . . . ." (Pen. Code, § 189.) The mental state required is, of course, a deliberate and premeditated intent to kill with malice aforethought. (See *id.*, §§ 187, subd. (a), 189.)

Similarly, "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate," certain enumerated felonies, including rape, "is murder of the first degree . . . ." (Pen. Code, § 189.) ▆▆▆ The mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed. (See, e.g., *People* v. *Coefield* (1951) 37 Cal.2d 865, 868-869 [236 P.2d 570]; see, generally, 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against the Person, § 470, p. 528; see also *People* v. *Hernandez* (1988) 47 Cal.3d 315, 346 [253 Cal.Rptr. 199, 763 P.2d 1289] [stating that "[w]e have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies, even where that felony is a crime such as rape"].) There is no requirement of a strict "causal" (e.g., *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]) or "temporal" (e.g., *People* v. *Hernandez, supra*, 47 Cal.3d at p. 348) relationship between the "felony" and the "murder." All that is demanded is that the two "are parts of one continuous transaction." (E.g., *People* v. *Ainsworth, supra*, 45 Cal.3d at p. 1016; see, e.g., *People* v. *Hernandez, supra*, 47 Cal.3d at p. 348.) There is, however, a requirement of proof beyond a reasonable doubt of the underlying felony. (See, e.g., *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].)

▆▆▆ Defendant maintains that the evidence is insufficient as to the felony-murder-rape theory.

In part, defendant argues that evidence is lacking for rape. He is unpersuasive. The analysis above proves the point.

In other part, defendant argues that evidence is lacking for specific intent to commit the underlying felony of rape. Again, he is unpersuasive. A rational trier of fact could surely have found the requisite intent beyond a

reasonable doubt. There are facts disclosing defendant's manifest desire to engage in sexual intercourse with any woman whom he could "pick up": remember Pena. There are also facts disclosing Hildreth's manifest desire not to engage in sexual intercourse with him: remember the appearance and condition of her body when it was found.

In still other part, defendant argues that the "evidence failed to establish either an intent to kill or, if such intent existed, that it arose prior to conclusion of the rape. An intent to kill formed after termination of any actual or attempted rape, and unrelated to those offenses, would not support a felony-murder conviction . . . ." Yet again, he is unpersuasive. Contrary to what appears to be his assumption, felony murder does not require intent to kill or a strict "causal" or "temporal" relationship between the "felony" and the "murder." In any event, the relationship that a rational trier of fact could have discerned from the evidence is enough.[12]

Defendant also maintains that the evidence is insufficient as to the willful, deliberate, and premeditated murder theory. This point need not be addressed. The conviction rests, at least, on the adequately supported felony-murder-rape theory. The fact is established by the jury's first degree murder and rape verdicts and its felony-murder-rape special-circumstance finding— which, under the instructions actually given, necessarily entail a unanimous determination of felony-murder-rape beyond a reasonable doubt. (Compare *People* v. *Hernandez*, *supra*, 47 Cal.3d at p. 351 [arriving at a similar conclusion on a similar record]; *People* v. *Ainsworth*, *supra*, 45 Cal.3d at pp. 1015-1016 [same].)[13]

J. *Reversibility of the First Degree Murder Conviction Under the Green Rule*

In *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (hereafter *Green*), we stated the following rule: "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt

[12]Defendant may be understood to claim that the court erred by failing to instruct the jury on intent to kill as an "element" of first degree felony murder. But as explained in the text, intent to kill is not an element.

[13]Defendant claims that to the extent that the evidence is insufficient to support his convictions under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, such convictions are invalid as well under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments; article I, sections 7, 15, 16, and 17 of the California Constitution; and California statutory and decisional law. The evidence, however, is not insufficient.

rested, the conviction cannot stand." (*Id.* at p. 69, disapproved on another point, *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].)

In *People* v. *Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45] (hereafter *Guiton*), we construed the rule of *Green* "as applying only to cases of *legal* insufficiency" and not to cases of *factual* insufficiency, i.e., those in which the evidence is insufficient. (*Id.* at p. 1128, italics in original.)

Defendant contends that, under the rule of *Green*, his conviction for first degree murder must be reversed. We disagree. The *Green* rule simply does not apply. We have already determined from the record that the first degree murder verdict rests, at least, on the theory of felony-murder-rape. (See pt. II.I., *ante*.) To our mind, that theory is legally sufficient. Defendant argues otherwise. He asserts that the theory is "tainted by reversible legal error . . . ." He does not persuade: his points have previously been considered and rejected. He also argues that the theory is factually insufficient. As construed in *Guiton*, the *Green* rule does not cover such inadequacy. All the same, the evidence is indeed sufficient. (See pt. II.I., *ante*.)[14]

### III. DEATH-ELIGIBILITY ISSUES

Defendant challenges the determination that he was subject to the death penalty. As relevant here, death eligibility is established when the defendant is convicted of murder in the first degree under at least one special circumstance. (Pen. Code, § 190.3.) As shown above, defendant has not successfully attacked the jury's verdict of guilty as to murder in the first degree. As shown below, he does not successfully attack its felony-murder-rape special-circumstance finding. Hence, the challenge fails.

### A. *Prosecutorial Misconduct as to Death Eligibility*

Defendant contends in substance that on numerous occasions before the jury the prosecutor engaged in misconduct as to death eligibility. This claim is dependent on the point charging the prosecutor with misconduct as to

---

[14]Defendant claims in substance that reversal under the rule of *Green*, at least in this case, entails reversal as well under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. The *Green* rule, however, does not apply. Defendant appears to argue that the rule should somehow be extended because this is a capital case. We do not agree.

Separately and independently, defendant claims that the "cumulative effect of errors" (capitalization omitted) bearing on guilt amounts to a violation of his rights under, inter alia, the Fifth, Sixth, and Fourteenth Amendments and article I, sections 7, 15, and 16 and, as a consequence, requires reversal as to that issue. There were no such errors and no such effect.

guilt. The latter fails both at the threshold and on the merits. (See pt. II.C., *ante*.) So must the former.[15]

B. *Refusal of an Instruction on Intent to Kill as an Element of the Felony-murder Special Circumstance*

 The felony-murder special circumstance covers the situation in which the "murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" certain enumerated felonies, including rape. (Pen. Code, § 190.2, subd. (a)(17)(iii).)

The felony-murder special circumstance is generally similar to felony murder. (3 Witkin & Epstein, Cal. Criminal Law, *supra*, Punishment for Crime, § 1582, pp. 1886-1887.) Two comments, however, should be made.

The first relates to independent felonious purpose. The felony-murder special circumstance requires that the "defendant [must] commit[] the act resulting in death in order to advance an independent felonious purpose." (*People* v. *Bonin* (1989) 47 Cal.3d 808, 850 [254 Cal.Rptr. 298, 765 P.2d 460].)

The second—which is of direct concern here—relates to intent to kill. In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862] (hereafter *Carlos*), we concluded in substance that intent to kill is an element of the felony-murder special circumstance. In *People* v. *Anderson*, *supra*, 43 Cal.3d 1104, 1147 (hereafter *Anderson*), we overruled *Carlos* and held to the contrary. But when, as here, the "felony-murder special circumstance is alleged to have occurred after *Carlos* and before *Anderson*, the former governs." (*People* v. *Ashmus*, *supra*, 54 Cal.3d at p. 981.)

 The court generally instructed the jury on the felony-murder-rape special circumstance alleged in this case. In most respects, it did so properly. Under the erroneous belief that *Anderson* controlled and not *Carlos*, however, it refused to instruct on the element of intent to kill. But in an evident attempt to cure error or avoid prejudice in the event that its view proved to

---

[15]Defendant claims in substance that the asserted prosecutorial misconduct bearing on death eligibility requires reversal under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. There was no misconduct. Certainly, the complained-of comments by the prosecutor did not " 'so infect[] the trial with unfairness as to make the resulting [determination of death eligibility] a denial of due process.' " (*Darden* v. *Wainwright*, *supra*, 477 U.S. at p. 181 [91 L.Ed.2d at p. 157].)

be unsound, it effectively instructed the jury, if it found defendant guilty of the first degree murder of Hildreth, to determine whether he killed her intentionally. As noted, the jury subsequently so found.

Defendant contends that the court erred by refusing to instruct the jury on intent to kill as an element of the felony-murder-rape special circumstance alleged in this case.

The standard of review for a claim of instructional error of this kind is de novo: the question is one of law, involving as it does the determination of the applicable legal principles (see *People* v. *Louis* (1986) 42 Cal.3d 969, 985 [232 Cal.Rptr. 110, 728 P.2d 180]).

After independent scrutiny, we conclude that the court did indeed err. As stated, *Carlos* governs here. Under *Carlos*, intent to kill is an element of the felony-murder special circumstance. Pursuant to *Carlos*, the court should have so instructed. Its refusal to do so was error under the due process clause of the Fourteenth Amendment to the United States Constitution. (See *People* v. *Odle* (1988) 45 Cal.3d 386, 412 [247 Cal.Rptr. 137, 754 P.2d 184]; *People* v. *Garcia* (1984) 36 Cal.3d 539, 552 [205 Cal.Rptr. 265, 684 P.2d 826].)

We further conclude, however, that the error does not require reversal. The erroneous omission of the element of intent to kill is not automatically reversible but rather is subject to harmless-error analysis under the "reasonable doubt" standard for federal constitutional error laid down in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]. (See generally, *People* v. *Odle*, *supra*, 45 Cal.3d at pp. 410-415.) In our view, it is not prejudicial on the facts of this case. "When, as here, under proper instructions the jury necessarily and soundly makes a finding adverse to the defendant on an issue erroneously omitted from the instructions"—in this case, intent to kill—"there is no prejudice arising from the omission." (*People* v. *Williams* (1992) 4 Cal.4th 354, 371-372 [14 Cal.Rptr.2d 441, 841 P.2d 961] (conc. opn. of Mosk, J.).)

Defendant argues to the contrary, attacking both our analysis and our conclusion. He is unpersuasive. His assertion, among others, that the jury's intentional-killing finding is ineffective for present purposes because it was allegedly not made "in the context of felony-murder or the special circumstance," and did not specify that he had the "intent to kill concurrent with any sexual assault" or "sexual activity," is altogether lacking in merit. Neither "context" nor "concurrence" is of any consequence here. Notwithstanding what appears to be his assumption, the felony-murder special circumstance does not require a strict "causal" or "temporal" relationship

between the "felony" and the "murder." Indeed, as noted, it extends even to the situation in which the "murder was committed while the defendant was engaged in . . . the immediate flight *after* committing" the felony. (Pen. Code, § 190.2, subd. (a)(17)(iii), italics added.) Plainly, it does not necessitate the "simultaneity" that defendant demands.[16]

## C. Ineffective Assistance of Counsel as to Death Eligibility

Defendant contends in substance that defense counsel provided him with ineffective assistance as to death eligibility in violation of the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution. This claim is dependent on the point charging counsel with ineffective assistance as to guilt. The latter fails. (See pt. II.H., *ante*.) So must the former.[17]

## D. Sufficiency of the Evidence for the Felony-murder-rape Special-circumstance Finding

Defendant contends that the evidence is insufficient to support the felony-murder-rape special-circumstance finding.

 " 'In reviewing the sufficiency of evidence for a special circumstance'—as for a conviction—'the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " (*People* v. *Rowland, supra,* 4 Cal.4th at p. 271, quoting *People* v. *Mickey, supra,* 54 Cal.3d at p. 678, italics in original.)[18]

Defendant's claim of insufficiency goes to the underlying felony of rape itself, independent felonious purpose, and intent to kill.

---

[16]Defendant claims in substance that the court's refusal to instruct on intent to kill as an element of the felony-murder-rape special circumstance alleged in this case amounts to reversible error violative of, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. Defendant's point essentially rehearses his unpersuasive argument that the error requires reversal. It falls of its own weight.

[17]Defendant appears to claim constructive denial of counsel bearing on death eligibility. The point is without merit.

Defendant may be understood to claim that defense counsel's ineffective assistance under the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution bearing on death eligibility entails the violation of other provisions of the federal and state charters, including the Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17. There was, however, no ineffective assistance.

[18]In this case, "[w]e need not, and do not, reach the question whether the sufficiency-of-evidence review specified in the text is required under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution." (*People* v. *Rowland, supra,* 4 Cal.4th at p. 271, fn. 11.)

In view of the evidence, which is described above (see pt. I.A., *ante*) and need not be rehearsed here, a rational trier of fact could certainly have found the felony-murder-rape special-circumstance allegation to be true beyond a reasonable doubt. That is to say, such a trier of fact could surely have determined to that degree of certainty that defendant murdered Hildreth while he was engaged in raping her or at least in fleeing the crime scene immediately thereafter.

Defendant's complaint about the asserted lack of evidence of the underlying felony of rape fails. Its substance has already been assessed and found wanting. (See pt. II.I., *ante*.)

Defendant's complaint about the asserted lack of evidence of independent felonious purpose also fails. A rational trier of fact could have found beyond a reasonable doubt that he committed the act resulting in death in order to commit rape.

 Finally, defendant's complaint about the asserted lack of evidence of intent to kill fails as well. A rational trier of fact could have found beyond a reasonable doubt that he sought to eliminate Hildreth as a witness to his crimes, a witness who could have identified him positively. Without question, such a trier of fact could have declined to accept as accidental the act of fatally stabbing Hildreth or the act of pressing down her cheek with the sole of a shoe as she lay dying. Defendant asserts that an "intent to kill formed after termination of any actual or attempted rape, and unrelated to those offenses, would not support a felony-murder . . . special circumstance." Contrary to what appears to be his assumption, the felony-murder special circumstance does not require a strict "causal" or "temporal" relationship between the "felony" and the "murder." In any event, the relationship that a rational trier of fact could have discerned from the evidence is enough.[19]

## IV. Penalty Issues

Defendant raises a number of claims attacking the judgment as to penalty. As will appear, none is meritorious.

---

[19]Defendant may be understood to claim that to the extent that the evidence is insufficient to support the felony-murder-rape special-circumstance finding, such a finding is invalid under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; article I, sections 7, 15, 16, and 17 of the California Constitution; and California statutory and decisional law. The evidence, however, is not insufficient.

Separately and independently, defendant claims that the "cumulative effect of errors" (capitalization omitted) bearing on death eligibility amounts to a violation of his rights under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17 and, as a consequence, requires reversal as to that issue. There was only one such error and no such effect.

## A. *Evidence Concerning the Compensation of a Defense Expert*

As noted, in his case in mitigation defendant called as an expert witness Samuel George Benson, Jr., M.D., a psychiatrist. On cross-examination, the prosecutor sought to inquire into his compensation—specifically, the amount. Defense counsel objected to the admissibility of such evidence on the basis of Penal Code section 987.9 and its "confidentiality requirement." The court overruled the objection. On the prosecutor's inquiry, Dr. Benson testified: "My fee is $250 per hour. I believe I have spent about 32 hours on this case."

Defendant contends that the court erred by overruling his Penal Code section 987.9 objection to the admissibility of evidence concerning Dr. Benson's compensation and subsequently allowing the testimony in question. We reject the claim for the reasons stated against a similar point arising from the guilt phase. (See pt. II.B., *ante.*)

## B. *Prosecutorial Misconduct as to Penalty*

Defendant contends that on numerous occasions before the jury the prosecutor engaged in misconduct as to penalty.

After review, we reject defendant's claim at the threshold. He failed to satisfy the general rule requiring assignment of misconduct and request for admonition as to any of the comments or questions by the prosecutor of which he now complains. No exception is applicable.

We also reject defendant's claim on the merits. There is no reasonable likelihood that the jury construed or applied any of the complained-of comments or questions in an objectionable fashion. We do not overlook some apparent misstatements and other infelicities by the prosecutor. But when we consider each of the challenged remarks and queries in its context, we simply cannot conclude that the prosecutor used a method to persuade the jury that was "deceptive" or "reprehensible."

Let us consider as representative examples the three complaints to which defendant devotes the greatest number of pages in his briefing.

Defendant called his older brother Ronald Berryman as a witness in his case in mitigation.

On direct examination, defense counsel Peterson elicited potentially mitigating testimony from Ronald relating to defendant's background and character. In its course, Ronald compared defendant to "Casanova." Near its

conclusion, counsel asked, "Ronald, you've been convicted of a felony, haven't you?" Ronald answered, "Yes, I have." Counsel: "As I understand it, it has something to do with marijuana, and a transaction that Rodney was involved in, too; is that right?" Ronald: "Correct." Counsel: "And Rodney spent a little time in the county jail down in Los Angeles, right?" Ronald: "Yeah, but not that much." Counsel: "You went to state prison, didn't you?" Ronald: "Yes, I did."

On cross-examination, the prosecutor pursued the matter of Ronald's felony conviction. The following colloquy ensued.

"Q. And you were convicted of a felony. What felony specifically were you convicted of?

"A. Robbery, possession of dangerous weapons, firearms, drugs.

"Q. You?

"A. Me.

"Q. Now, were all those incidents in which your brother was involved?

"A. No, sir.

"Q. And the one that your brother was involved in, what one was that?

"A. That was narcotic—I think that might be when I was first arrested in the city of West Covina, when they had the biggest raid there, and we got caught up in a mix, Catch 22, and got busted.

"Q. Sales of marijuana, from an investigation coming from—

"A. The West Covina High School.

"Q. West Covina High School?

"A. Uh-huh, it was undercover in the West Covina High School.

"Q. Yeah, they thought you were selling to kids; is that correct?

"A. Well, not I, myself, but my brother, my brother was in high school at the time, so he was able to do that, because he was a high school kid himself.

"Q. You were supplying the stuff and he was actually doing the transaction, the transporting?

"...................................

"A. No."

Defendant claims to discern misconduct in the questioning of Ronald by the prosecutor. We do not. The prosecutor sought to impeach Ronald's credibility. His effort in this regard was not improper. Defendant's argument to the contrary is unpersuasive. His assertion to the effect that the prosecutor "intentionally elicit[ed] inadmissible and prejudicial evidence," namely, evidence that he "sold marijuana to kids" (underscoring omitted), is without adequate support. Strictly speaking, the prosecutor did not elicit the evidence by his question. Rather, Ronald volunteered it in an answer beyond the question's scope. The prosecutor's query did not portray defendant—as he would have it—as a "corrupter of the youth." Indeed, at the relevant time, defendant was a youth himself.

Next, in the course of his summation, the prosecutor referred to the penalty factor dealing with "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. Any evidence of that? No, there was not. . . . No evidence that while this act was occurring that he was under any extreme mental or emotional disturbance." The prosecutor also referred to the penalty factor dealing with "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to requirements of law was impaired as a result of mental disease or defect or the effects of intoxication. That's the old insanity defense. Did he know what he was doing was criminal? Did he have the ability to perform it, his behavior? No indication from anyone he had any sort of psychotic break or anything even approaching it that he didn't know what he was doing was criminal. Not a factor in mitigation."

Defendant claims to discern misconduct in the comments by the prosecutor quoted above. We do not. Defendant is right that the prosecutor misstated the law in remarking that the penalty factor on impairment of capacity was "the old insanity defense" (see *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720-721 [248 Cal.Rptr. 69, 755 P.2d 253])—although his mistake is readily understandable (cf. *People* v. *Drew* (1978) 22 Cal.3d 333, 336-337, 339-348 [149 Cal.Rptr. 275, 583 P.2d 1318] [adopting the standard proposed by the Am. Law Inst. in Model Pen. Code (Proposed Official Draft 1962) § 4.01, subd. (1): "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."], superseded by Pen.

Code, § 25, subd. (b).) But as noted, misstatement is not enough. Defendant is wrong, however, in the rest of his complaints. Contrary to his assertion, the prosecutor did not lead "the jury away from considering [potentially] mitigating evidence . . . ." (Underscoring deleted.)

Last, in the course of his summation, the prosecutor argued that the following penalty factors "had not been factors in mitigation": "[W]hether or not the victim was [a] participant in the defendant's homicidal conduct or consented to the homicidal act"; "did the defendant have a reasonable belief to be a moral justification or extenuation of his conduct?"; and "whether or not the defendant acted under extreme duress or under substantial domination of another person."

Defendant claims to discern misconduct in the comments by the prosecutor quoted above. We do not. Defendant argues that the prosecutor's remarks implied that the absence of each of the cited circumstances in mitigation amounted to the presence of a corresponding circumstance in aggravation. There is no reasonable likelihood that the jury so construed or applied the words in question. A reasonable juror would have understood and employed the language to mean nothing more objectionable than the tautology that the absence of mitigation is the absence of mitigation.[20]

## C. *Instruction on the "Circumstances of the Crime"*

In accordance with Penal Code section 190.3, as effectively construed in such decisions as *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 [196 Cal.Rptr. 309, 671 P.2d 813], the court instructed the jury as follows.

"In determining which penalty is to be imposed on . . . defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . . . You shall consider, take into account and be guided by the following factors, if applicable:

[20]Defendant claims in substance that the asserted prosecutorial misconduct bearing on penalty requires reversal under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. There was no misconduct. Certainly, the complained-of comments and questions by the prosecutor did not " 'so infect[ ] the trial with unfairness as to make the resulting [determination of penalty] a denial of due process.' " (*Darden* v. *Wainwright, supra,* 477 U.S. at p. 181 [91 L.Ed.2d at p. 157].)

Defendant also claims in substance that the asserted prosecutorial misconduct bearing on penalty gave rise to a duty on the part of the court to give certain "curative" instructions sua sponte, and that the court's failure to do so amounts to reversible error under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17. To repeat: there was no misconduct.

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (Brackets omitted.)

Defendant contends that the penalty factor dealing with the "circumstances of the crime," as specified in Penal Code section 190.3 and as set out in the instruction quoted above, is impermissibly vague under the cruel and

unusual punishments clause of the Eighth Amendment to the United States Constitution as construed in *Stringer* v. *Black* (1992) 503 U.S. ___ [117 L.Ed.2d 367, 112 S.Ct. 1130], and required clarification by the court even, as here, in the absence of a request. We reject the claim under the holding of *People* v. *Bacigalupo, ante*, page 457, at pages 478-479 [24 Cal.Rptr.2d 808, 862 P.2d 808] (hereafter *Bacigalupo*). Defendant argues that the court's "error" was "compounded" by its refusal of two "special" instructions he requested, viz., "Special Instruction '4' " and "Special Instruction '10'." (See pt. IV.F., *post.*) There was no "error" to be "compounded."[21]

### D. *Instruction on Pity, Sympathy, and Mercy*

At the guilt phase, the court had instructed the jury, in relevant part, as follows: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. . . . [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

At the penalty phase, defendant requested the court to give the jury, among others, "Special Instruction '16,' " which as pertinent here would have told the jurors that "[i]n this part of the trial you may consider pity, sympathy or mercy for the defendant in deciding on the appropriate penalty for him. If a mitigating circumstance or an aspect of the defendant's background or his character, called to you[r] attention by the evidence or your observation of the defendant . . . arouses sympathy or compas[s]ion such as to persuade you that death is not the appropriate penalty, you shall act in response thereto and impose a punishment of life without parole on that basis."

The court refused. It made plain its view that "Special Instruction '16' " was legally correct. It determined, however, that the "special" instruction was duplicative of certain other instructions that it intended to give. Defense counsel Peterson was in accord. "Defense would agree . . . . [W]e would invite the Court to refuse this instruction on the basis that the Court has already done substantially what is being proposed."

The court subsequently gave, among others, the following instruction, which it had itself drafted, in accordance with its expressed intent. "[Y]ou

---

[21]Defendant may be understood to claim that the penalty factor dealing with "age," as specified in Penal Code section 190.3 and as set out in the instruction quoted in the text, is also impermissibly vague. We reject the point under the reasoning of *Bacigalupo*.

were previously instructed not to consider penalty in the guilt or innocence phrase of the trial, and of course, that is your consideration in this phase. That instruction would be totally inapplicable. [¶] You will also be instructed at this time that you can consider sympathy for the defendant in deciding this continuing issue, and that was, of course, precluded from the guilt or innocence phase of the trial."

As pertinent here and noted above (see pt. IV.C., *ante*), the court told the jurors that in determining penalty they were to consider several specified factors, if applicable, including "[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (Brackets omitted.)

The court also told the jurors that in determining penalty, "you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

 Defendant now contends that, by instructing the jury as it did, the court erred under the Eighth and Fourteenth Amendments to the United States Constitution. In support, he effectively asserts that the instructions quoted above told the jury that in determining penalty it could not consider or give effect to pity, sympathy, or mercy, or at least did not tell it that it could. We reject the claim out of hand. A reasonable juror would have understood and employed the instructions in question to allow him to consider and give effect to pity, sympathy, and mercy to the extent he deemed appropriate in this case—and indeed to require him to do so. There is no reasonable likelihood that the jury misconstrued or misapplied the instructions in violation of the Eighth or Fourteenth Amendment or any other legal provision or principle.

E. *Instruction to Weigh the "Totality" of the Aggravating and Mitigating Circumstances*

As noted (see pt. IV.D., *ante*), the court instructed the jury that in determining penalty, "you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the *totality* of the aggravating circumstances with the *totality* of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.) Defendant had requested an instruction to such effect.

Defendant now contends that, by instructing the jury as it did, the court erred.

Defendant's argument appears to be this: with its language referring to the "totality" of the aggravating and mitigating circumstances, the instruction in question erroneously implied that a single mitigating circumstance could not outweigh any and all aggravating circumstances and hence could not support a decision that death was not the appropriate punishment.

An instruction containing an implication of this sort would indeed have been erroneous. In *People* v. *Grant* (1988) 45 Cal.3d 829, 857, footnote 5 [248 Cal.Rptr. 444, 755 P.2d 894], we characterized as "proper" an instruction that stated, inter alia, that " '[o]ne mitigating circumstance may be sufficient to support a decision that death is not appropriate punishment in this case.' " An instruction to the contrary would obviously be improper.

The instruction here, however, was not such. In fact, a reasonable juror would have understood and employed its words to embrace the substance of what was found proper in *Grant*. Certainly, such a juror would not have interpreted or used its language referring to the "totality" of the aggravating and mitigating circumstances in a "death oriented" fashion to "relate[]" solely to the "quantity . . . of the factors" and not to their "quality," or to entail " 'a *mere mechanical counting* of factors on each side of the imaginary

scale . . . .' " (Underscoring in original.) There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction in violation of the Eighth or Fourteenth Amendment to the United States Constitution or any other legal provision or principle. True, an instruction like that in *Grant* would have been proper. But it was simply not required.

### F. *Refusal of "Special" Instructions Requested by Defendant*

 Defendant contends that the court erred by refusing to give the jury certain "special" instructions he requested. We shall consider his claims seriatim.

Defendant requested "Special Instruction '1' ": "The only aggravating factors which you may consider are those listed in . . . the instruction I have just read to you. No other facts or circumstances may be considered in aggravation or as a reason to support a verdict of death."

The court refused, reasoning in part that this "special" instruction was duplicative of another instruction that it intended to, and did in fact, give, which specified the factors to be considered in determining penalty "if applicable."

The refusal was not error. What was express in this "special" instruction was implicit in the instruction actually given. Reasonable jurors would have understood and employed the latter to "allow [them] to consider [for purposes of aggravation] the listed penalty factors, 'if applicable,' and to prohibit [them] from considering others." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1275 [arriving at a similar conclusion as to a similar instruction on a similar record].) There is no reasonable likelihood that the jury would have construed or applied the standard instruction otherwise. In this regard, we do not overlook certain of the prosecutor's comments and questions to which defendant points. As a general matter at least, the prosecutor did not mislead. The one possible exception: In his summation, he characterized defendant as a "Casanova" or "philander[er]," and "suggest[ed] . . . that is [a] factor in aggravation and even more so than it would be in mitigation." The characterization was squarely based on the evidence. As noted, Ronald Berryman had compared defendant to "Casanova." The suggestion was brief and opaque. It must be deemed without effect.[22]

Defendant requested "Special Instruction '2' ": "Aggravating factors, and the facts upon which they are based, must be proved beyond a reasonable

---

[22]Defendant claims that the refusal of this "special" instruction was erroneous as violative of the due process clause of the Fourteenth Amendment to the United States Constitution. The point rests on the premise that the jury would have misconstrued or misapplied the instruction

doubt. If any aggravating factor is not proved beyond a reasonable doubt, you must disregard it."

The court refused on the ground that this "special" instruction was not legally correct.

■ The refusal was not error. As a general matter, "[w]e have consistently rejected the contention that the beyond-a-reasonable-doubt standard applies to the process of penalty determination . . . ." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) In particular, the 1978 death penalty law does not require "imposition on the People of the burden of proof beyond a reasonable doubt as to [any] of the following issues . . . : (1) a circumstance in aggravation may be considered only if its existence is proved beyond a reasonable doubt; (2) the penalty may be fixed at death only if the aggravating circumstances are found to outweigh the mitigating beyond a reasonable doubt; and (3) the penalty may be fixed at death only if death is determined to be the appropriate punishment beyond a reasonable doubt." (*People* v. *Mickey, supra,* 54 Cal.3d at p. 701.) Neither do the United States and California Constitutions impose any such burden—specifically, neither do (1) the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; nor (3) the equal protection clauses of the Fourteenth Amendment and article I, section 7. (54 Cal.3d at pp. 701-702.)[23]

■ Defendant requested "Special Instruction '3'": "You must be unanimous as to the existence of any aggravating factor before it may be considered; if you do not unanimously agree that an aggravating factor exists, no juror may consider it in reaching his or her penalty verdict."

The court refused, reasoning that this "special" instruction was not legally correct.

The refusal was not error. It is *not* the law—contrary to the substance of this "special" instruction—that "jury unanimity on . . . aggravating factors" is required. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1251-1252 [283

---

actually given as he asserts. As we concluded in the text, there is no reasonable likelihood that it would have done so.

[23]Defendant claims that the refusal of this "special" instruction was erroneous as violative of (1) the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and (3) the equal protection clauses of the Fourteenth Amendment and article I, section 7. As noted in the text, we have held to the contrary. We shall not revisit the question.

Cal.Rptr. 144, 812 P.2d 163], citing cases [speaking expressly and specifically of the 1978 death penalty law, Pen. Code, § 190 et seq., and impliedly and generally of U.S. Const. and Cal. Const.].)[24]

Defendant requested "Special Instruction '4'": "The fact that defendant . . . has been found guilty of first degree murder is not itself an aggravating factor."

The court refused on what appears to be the ground that this "special" instruction was confusing: "You have to be careful to point out they can consider the facts and circumstances of the conviction in this case."

The refusal was not error. A court "may . . . refuse an instruction that is confusing." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1275.) The standard of review is abuse of discretion. (*Ibid.*) In our view, the court could reasonably have concluded that this "special" instruction was indeed confusing inasmuch as it might have interfered with the altogether permissible, and in fact mandatory, "consideration" of the "facts and circumstances of the conviction in this case." Defendant argues that the "prejudice" from this "error" was "exacerbated" or "compounded."[25] There was no error. Hence, there was no prejudice to be "exacerbated" or "compounded."[26]

Defendant requested "Special Instruction '7'": "You may consider any evidence tending to show that defendant . . . was under the influence of a

---

[24]Defendant claims that the refusal of this "special" instruction was erroneous as violative of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. "[J]ury unanimity on . . . aggravating factors" is not required under any of these federal constitutional provisions—or any others. (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1251-1252 [speaking impliedly and generally of, inter alia, the U.S. Const.].)

[25]Defendant may be understood to claim, separately and independently, that the court erred by instructing the jury as follows. "Evidence has been introduced for the purpose of showing that the defendant . . . has been convicted of the crimes of Transportation of Marajauna [*sic*] and Grand Theft prior to the offense of murder in the first degree of which he has been found guilty in this case. [¶] Before you may consider any of such alleged crimes as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant was in fact convicted of such prior crimes. You may not consider any evidence of any other criminal conviction *other than the conviction in this case* as an aggravating circumstance." (Italics added and brackets omitted.) Defendant's point appears to be that the italicized language implied that the jury could consider his conviction for first degree murder as itself a circumstance in aggravation. There is no reasonable likelihood that the jury so understood or employed the language in question. To our mind, a reasonable juror would probably have construed and applied the somewhat awkward phrasing so as not to bar consideration of the "circumstances of the crime of which the defendant was convicted in the present proceeding . . . ."

[26]Defendant claims that the refusal of this "special" instruction was erroneous as violative of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Our determination that the court could reasonably have concluded that this instruction was confusing entails the rejection of this point. An instruction of this kind could not be required by the United States Constitution.

mental or emotional disturbance at the time of the offense, regardless of the degree of that disturbance."

The court refused, reasoning that this "special" instruction was duplicative of another instruction that it intended to, and did in fact, give.

The refusal was not error. This "special" instruction was in fact duplicative. It was more than adequately covered by the directive that the jury consider "[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Brackets omitted.)[27]

Defendant requested "Special Instruction '10' ": "You are free to consider any evidence offered by the defendant . . . in mitigation in determining whether death is the appropriate penalty for this defendant based upon his individual characteristics and notwithstanding the degree of his culpability for the offense."

The court refused on the ground that this "special" instruction was duplicative of another instruction that it intended to, and did in fact, give.

The refusal was not error. This "special" instruction was in fact duplicative. It was more than adequately covered by the directive, quoted above, that the jury consider "[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Brackets omitted.)[28]

Defendant requested "Special Instruction '11' ": "It is appropriate for you to consider in mitigation any 'lingering doubts' you may have concerning

[27]Defendant claims that the refusal of this "special" instruction was erroneous as violative of (apparently) the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The point rests on the premise that the jury would have misconstrued or misapplied the instruction quoted in the text contrary to the clear meaning of its plain terms. There is no reasonable likelihood that it would have done so. We recognize that in conjunction with this point defendant asserts that the prosecutor committed misconduct by arguing in summation to the effect that less than extreme "mental or emotional disturbance" could not be considered as a circumstance in mitigation. That is simply not the case. There is no reasonable likelihood that the jury would have so understood or employed his words.

[28]Defendant claims that the refusal of this "special" instruction was erroneous as violative of (apparently) the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The point rests on the premise that the jury would have misconstrued or misapplied the instruction quoted in the text contrary to the clear meaning of its plain terms. There is no reasonable likelihood that it would have done so. We recognize that in conjunction with this

the defendant's guilt. [¶] Lingering or residual doubt is defined as that state of mind between 'beyond a reasonable doubt' and 'beyond all possible doubt.' "

The court refused, reasoning that this "special" instruction was duplicative of another instruction that it intended to, and did in fact, give.

The refusal was not error. This "special" instruction was in fact duplicative. The court directed the jury to consider certain factors in determining penalty. One was the "circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." "This was broad enough to include 'lingering doubt.' " (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1262 [14 Cal.Rptr.2d 702, 842 P.2d 1] (conc. opn. of Mosk, J.) [reviewing the same instructional language].) Another factor was "[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Brackets omitted.) "This too was broad enough to include 'lingering doubt.' " (*Ibid.* (conc. opn. of Mosk, J.) [reviewing similar instructional language].) Of course, a "defendant has no federal or state constitutional right to" a "lingering doubt" instruction. (*Id.* at p. 1252.)[29]

Defendant requested "Special Instruction '12' ": "In order to impose the death sentence, you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh[es] the totality of the mitigating circumstances. If you are not convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you must return a verdict of life imprisonment without the possibility of parole."

The court refused on the ground that this "special" instruction was not legally correct.

The refusal was not error. As explained, it is *not* the law—contrary to the substance of this "special" instruction—that the "penalty may be fixed at

point defendant asserts that the prosecutor committed misconduct by arguing in summation to the effect that the jury could or should decline to consider evidence defendant offered in mitigation. That is simply not the case. There is no reasonable likelihood that the jury would have so understood or employed his words.

[29]Defendant claims that the refusal of this "special" instruction was erroneous as violative of asserted rights under the Eighth and Fourteenth Amendments to the United States Constitution (including, specifically, the latter amendment's due process and equal protection clauses) and article I, sections 7, 15, and 17 of the California Constitution. As stated in the text above, a "defendant has no [such] federal or state constitutional right . . . ." (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1252.)

death only if the aggravating circumstances are found to outweigh the mitigating beyond a reasonable doubt . . . ." (*People* v. *Mickey, supra*, 54 Cal.3d at p. 701.)[30]

Defendant requested "Special Instruction '13' ": "In order to impose a death sentence, you must be convinced beyond a reasonable doubt that death is the appropriate punishment for the defendant. If you are not convinced beyond a reasonable doubt that death is the appropriate punishment, you must return a verdict of life imprisonment without the possibility of parole."

The court refused on the ground that the instruction was not legally correct.

The refusal was not error. As explained, it is *not* the law—contrary to the substance of this "special" instruction—that the "penalty may be fixed at death only if death is determined to be the appropriate punishment beyond a reasonable doubt." (*People* v. *Mickey, supra*, 54 Cal.3d at p. 701.)[31]

G. *Denial of Verdict-modification Application*

 Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e). The court denied the request. Erroneously, contends defendant.

 " 'In ruling on a verdict-modification application, the trial judge is required . . . to "make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law." That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves.' " (*People* v. *Clair, supra*, 2 Cal.4th at p. 689.) The "trial judge's function," it must be emphasized, "is not to make an independent and de novo penalty determination, but rather to independently reweigh

---

[30]Defendant claims that the refusal of this "special" instruction was erroneous as violative of (1) the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and (3) the equal protection clauses of the Fourteenth Amendment and article I, section 7. As noted in the text, we have held to the contrary. We shall not revisit the question.

[31]Defendant claims that the refusal of this "special" instruction was erroneous as violative of (1) the cruel and unusual punishments clauses of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and (3) the equal protection clauses of the Fourteenth Amendment and article I, section 7. As noted in the text, we have held to the contrary. We shall not revisit the question.

the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.*" (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], italics in original.) "Further, in deciding the question, the trial judge must 'specify reasons . . . sufficient "to assure thoughtful and effective appellate review." ' " (*People* v. *Clair, supra,* 2 Cal.4th at p. 689.)

"On appeal, we subject a ruling on a verdict-modification application to independent review." (*People* v. *Clair, supra,* 2 Cal.4th at p. 689.) "Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (*People* v. *Mickey, supra,* 54 Cal.3d at p. 704.)

▓▓▓▓ After independent review, we find no error. The court gave a lengthy and detailed statement of reasons. In part, it declared: "[As] to factor A under [Penal Code section] 190.3, and that's the circumstances of the present offense. [¶] In that situation, the Court is aware of all of the circumstances and the evidence presented. The Court is satisfied, in reviewing that evidence, that this was a particularly vicious and brutal and senseless killing of a 17 year old girl, who apparently refused to give into the amorous advances of Mr. Berryman. He thereafter forced himself on her, and stabbed her in the neck, and apparently stood over her with his foot on her face until she bled to death. [¶] Then not long after that, he returns home for a little lasagne. [¶] This is an extremely substantial factor in aggravation, and in the Court's view, this factor in aggravation, in and of itself, would outweigh all of the mitigating circumstances . . . ." In our view, the court satisfied the requirements of Penal Code section 190.4, subdivision (e). Its denial of modification was sound.

Defendant argues to the contrary. Unpersuasively.

For example, defendant asserts that the court read the probation report before ruling on the verdict-modification application. Even if it did, "absent evidence in the record to the contrary, we must assume that the court was not improperly influenced" thereby. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906].) No improper influence appears. Notwithstanding defendant's claim, reversal is not required by the Fifth, Eighth, or Fourteenth Amendment to the United States Constitution or by any other legal provision or principle.

Defendant asserts that the court did not independently reweigh the evidence. The record is otherwise. The court's statement of reasons reveals that it recognized, and actually discharged, its obligation in this regard.

On a related point, defendant asserts that the court did not *properly* reweigh the evidence. His complaint is essentially a disagreement with the result. It is unfounded.

Defendant may be understood to assert that the court could not have independently and properly reweighed the evidence in the absence of "findings" by the jury on aggravating and mitigating circumstances. We disagree. Contrary to what appears to be his assumption, the court is required to review the verdict of death itself and not any underlying "findings."

Defendant also asserts that the court failed or refused to consider evidence he had offered in mitigation. Here too, the record is otherwise. The court's statement of reasons proves the point. Defendant maintains that the court "relied upon and was misled by" the probation report. We cannot so conclude.

Defendant cites the court's omission of reference to certain potentially mitigating background and character evidence. "Although the trial court did not expressly *mention* the [potentially] mitigating evidence referred to by defendant, there is no indication in the record that the court ignored or overlooked such evidence." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854], italics in original.)

Defendant appears to assume that the court was required to conclude that the evidence he had offered in mitigation did in fact amount to a mitigating circumstance. The assumption is unsound. One matter deserves specific mention. The court stated: "Next factor I want to comment on is I, which is age of the defendant at the time of the incident, was 21 years of age." "Although the defendant was young at that particular point in time, he was not that young, and he had been out of school for several years, he was married, had a child. As far as this Court is concerned, that factor is a neutral factor in this particular case." Defendant argues that this penalty factor in Penal Code section 190.3 is impermissibly vague under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution. We have held contra. (See fn. 21, *ante*.) Defendant then argues that the court was required by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution to find that his age was in fact a mitigating circumstance. It was not.

In addition, defendant asserts that the court found aggravating circumstances that were not specified in Penal Code section 190.3 or, if specified, were not supported by the evidence. That is simply not the case.

Defendant also asserts that the court converted "mitigating evidence into aggravating evidence" and "mitigating circumstances into nonstatutory aggravating circumstances." That is also not the case.

### H. *Ineffective Assistance of Counsel as to Penalty*

 Defendant contends that defense counsel provided him with ineffective assistance as to penalty in violation of the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution.

At the penalty phase, the prosecutor called only a few witnesses in the case in aggravation. For their part, defense counsel called more than a score in the case in mitigation, presenting, inter alia, evidence about defendant's background and character from the mouths of family members and friends and also from a psychologist and a psychiatrist. After the penalty phase, they made several motions, including the verdict-modification application.

Defendant claims that defense counsel performed deficiently with regard to numerous cited acts and omissions and thereby subjected him to prejudice. In large part, he simply recasts arguments for reversal that we have expressly or impliedly disposed of in the course of the preceding analysis. He is indeed forceful in presenting his complaints. We have carefully considered each in its proper context. In few if any instances does he show professionally unreasonable conduct. In none does he show a reasonable probability of an adverse effect on the outcome.

For example, defendant does not establish ineffective assistance in defense counsel's asserted failure to pursue neurological testing to determine whether and to what extent he suffered from an organic mental syndrome or disorder. He does not demonstrate that such testing would have yielded favorable results. Hence, he cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.

Neither does defendant establish ineffective assistance in defense counsel's asserted failure to further investigate his background and character and then to introduce additional evidence thereon. He does not demonstrate that such further investigatory efforts would have yielded favorable results. Hence, he cannot demonstrate that their omission adversely affected the outcome within a reasonable probability.

Further, defendant does not establish ineffective assistance in defense counsel Peterson's decision not to personally prepare witnesses for their testimony: "I . . . make it a practice to not talk directly with witnesses but have that done by investigation"—evidently to avoid suspicion of "coaching." He does not demonstrate that personal preparation would have yielded favorable results. Hence, he cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.

In addition, defendant does not establish ineffective assistance in defense counsel Peterson's opening statement or summation. We have reviewed, among all the others, Peterson's comments in his opening statement and summation to the effect that a governor could, but would not, commute any sentence of life imprisonment without possibility of parole imposed on defendant. The remarks appear to be a reasonable attempt to anticipate and allay a possible concern on the part of the jurors. We have also reviewed Peterson's argument for life in his summation, the gravamen of which was that a sentence of life imprisonment without possibility of parole was severe and sufficient punishment in this case. The plea, although not as positive as defendant now asserts it should have been, seems a reasonable effort in light of the evidence introduced as to the criminal and his crime. Finally, we have reviewed Peterson's comment in his summation that "giving you the greatest latitude, it took you 15 minutes to reach a verdict" at the guilt phase and "[t]hat was an insult to [the trial judge], to the prosecutor, and to the defense attorney, but it is your verdict." The remark was indeed intemperate. But it was also brief. It did not deny defendant effective assistance.[32]

I. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is facially invalid under the United States and California Constitutions, and hence that the judgment of death entered pursuant thereto is unsupported as a matter of law. "[A]s a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. In his argument here, defendant raises certain specific constitutional challenges. But . . . in the . . . series of cases [beginning with *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 (230 Cal.Rptr. 667, 726 P.2d 113)], we have rejected each and every one. We see no need to rehearse or revisit our holdings or their underlying reasoning." (*People* v. *Ashmus, supra,* 54 Cal.3d at pp. 1009-1010; accord, *People* v. *Rowland, supra,* 4 Cal.4th at p. 283; *People* v. *Clair, supra,* 2 Cal.4th at p. 691.)

---

[32]Defendant appears to claim constructive denial of counsel bearing on penalty. The point is without merit.

Defendant may be understood to claim that the asserted ineffective assistance by defense counsel under the Sixth Amendment to the United States Constitution and/or article I, section 15 of the California Constitution bearing on penalty entails the violation of other provisions of the federal and state charters, including the Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17. There was, however, no ineffective assistance.

Defendant also claims in substance that the asserted ineffective assistance by defense counsel under the Sixth Amendment and article I, section 15 bearing on penalty gave rise to a duty on the part of the court to give certain "curative" instructions sua sponte, and that the court's failure to do so amounts to reversible error under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17. To repeat: there was no ineffective assistance.

### J. *Proportionality of the Sentence of Death*

The cruel or unusual punishment clause of article I, section 17 of the California Constitution " 'prohibits the imposition of a penalty that is disproportionate to the defendant's "personal responsibility and moral guilt." ' " (*People* v. *Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant contends that the sentence of death imposed on him violates this prohibition. In view of the evidence adduced at trial, which is described above (see pt. I, *ante*) and need not be rehearsed here, we must reject the claim as lacking in merit.

### K. *Constitutionality of the Method of Execution*

 As originally enacted, Penal Code section 3604 provided that the "punishment of death shall be inflicted by the administration of a lethal gas." (Stats. 1941, ch. 106, § 15, p. 1117.)

In his opening brief, defendant raised the contention that this method of execution amounts to "cruel and unusual punishment[]" within the meaning of the Eighth Amendment to the United States Constitution and/or "[c]ruel or unusual punishment" within the meaning of article I, section 17 of the California Constitution.

Subsequent to the filing of defendant's opening brief, the Legislature amended Penal Code section 3604 to provide that the "punishment of death shall be inflicted by the administration of a lethal gas *or by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death*" (*id.*, subd. (a), italics added) at the election of the condemned prisoner (*id.*, subd. (b)). In his reply brief, defendant states his point is now "moot."

In any event, the claim must be rejected out of hand as a ground for reversal of the judgment of death. It bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself.[33]

---

[33]Defendant claims that the "cumulative effect of errors" (capitalization omitted) bearing on penalty amounts to a violation of his rights under, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution and, as a consequence, requires reversal as to that issue. There was no such error and no such effect.

We are of the opinion that, in view of the prosecutor's all but express withdrawal of the willful, deliberate, and premeditated murder theory during summation at the guilt phase, any assumed insufficiency of the evidence as to that theory would have been without prejudicial effect on the jury's verdict of death or the court's ensuing judgment.

Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Florence Hildreth within the meaning of *Enmund* v.

## V. Disposition

Having found no reversible error or other defect, we conclude that the judgment must be affirmed.

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

MOSK, J.—I concur, of course, in the opinion prepared for the court. I write separately merely to note that I have rejected defendant's claims based on *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130], under compulsion of *People* v. *Bacigalupo, ante,* page 457 [24 Cal.Rptr.2d 808, 862 P.2d 808], a case I believe was erroneously decided (see *id.* at pp. 484-493) (conc. and dis. opn. of Mosk, J.).

Appellant's petition for a rehearing was denied March 16, 1994, and the opinion was modified to read as printed above.

---

*Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]. We also conclude that these findings are amply supported. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment to the United States Constitution. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 106 S.Ct. 689].)

"Whether or not expressly discussed, we have considered and rejected . . . all of the assignments of error presented in all of defendant's briefs." (*People* v. *Sully, supra,* 53 Cal.3d at p. 1252.)