**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RODNEY BERRYMAN, SR.,
*Petitioner-Appellant*,

v.

ROBERT K. WONG,
*Respondent-Appellee.*

No. 10-99004

D.C. No.
1:95-cv-05309-AWI

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted January 30, 2019
University of San Diego, California

Filed March 27, 2020

Before:  M. Margaret McKeown, Morgan Christen,
and Paul J. Watford, Circuit Judges.

Per Curiam Opinion

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's denial of Rodney Berryman, Sr.'s federal habeas corpus petition challenging his California state murder conviction and death sentence.

In Claim 65, as to which the district court granted a certificate of appealability, Berryman alleged that he was denied his Sixth Amendment right to counsel at the penalty phase because his lawyers failed to present additional evidence of his family history and social background. The panel held that fairminded jurists could conclude that the California Supreme Court's conclusion that Berryman failed to show that he was prejudiced by any deficiency in his counsel's performance was correct.

The panel granted Berryman's motion to expand the COA as to four additional claims.

In Claims 15 and 16, Berryman alleged that his trial lawyers were ineffective in (a) failing to present expert psychological and psychiatric testimony at the guilt phase to support his argument that the killing was not premeditated or intentional and (b) failing to seek out and develop social history evidence and additional expert testimony to establish Berryman's brain disease and mental state for use at the guilty phase. The panel held that the California Supreme Court's determination that Berryman was not prejudiced by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

counsel's failure to seek out or present mens rea evidence at the guilty phase was reasonable.

In Claims 63 and 64, Berryman asserted that his lawyer was ineffective at the guilt and penalty phases for failing to obtain the trial court's transport order and funding authorization for neurological tests. The panel held that the California Supreme Court's conclusion that the tests lacked the capacity to produce results that might have moved a juror to vote to acquit or to vote for life in prison was reasonable, and that it was therefore reasonable for the California Supreme Court to conclude that Berryman suffered no prejudice from his defense counsel's failure to seek out these tests and press this argument.

## COUNSEL

Saor E. Stetler (argued), Mill Valley, California; Tim Brosnan, Mill Valley, California; for Petitioner-Appellant.

Brian R. Means (argued), Deputy Attorney General; Kenneth N. Sokoler and Brian G. Smiley, Supervising Deputy Attorneys General; Michael P. Farrell, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

**OPINION**

PER CURIAM:

A California jury sentenced Rodney Berryman, Sr., to death for the 1987 murder of Florence Hildreth. The California Supreme Court affirmed his conviction and sentence on direct appeal, *see People v. Berryman*, 864 P.2d 40, 48 (Cal. 1993), and summarily denied his state habeas petition. This is the appeal from the district court's denial of Berryman's federal petition for a writ of habeas corpus. We affirm.

## I. Background

### A. Guilt Phase

Berryman was convicted of murder with special circumstances: felony-murder-rape with the use of a dangerous weapon. *Id.* at 47. The jury heard that Hildreth, the victim, was a 17-year-old high school student. *Id.* at 48. She and Berryman were acquaintances. *Id.* Around 10:45 p.m. on the night of her death, Hildreth left one aunt's house to walk to another's. *Id.* She never reached her destination, and her body was found the next morning sprawled on a nearby dirt road. *Id.* at 48–49. Her clothes had been pulled partly off, and forensic evidence suggested that she had been sexually assaulted. *Id.* at 49. Her death was caused by a shallow stab wound in her neck, which had nicked her carotid artery. *Id.* A mark on her right cheek had evidently been left by the sole of a shoe, pressing down on her head for several minutes as she died. *Id.*

Shoe prints in the dirt at the crime scene were similar to those of Berryman's shoes, and nearby tire tracks were similar to the tracks left by the tires of Berryman's truck. *Id.*

A blood stain on his shoe was consistent with Hildreth's blood but not his own; it would have matched only 1 in 1,470 people who, like Hildreth, were African-American. *Id.* Small golden chain links found at the scene were consistent with a broken necklace found in Berryman's truck. *Id.*

Berryman told the police that Hildreth had never been in his truck, but her thumb print was found inside the passenger-door window. *Id.* He also said that he had not been on a nearby road the night of her death, but a witness saw his truck in that location. *Id.* at 48–49. Berryman appeared to know that Hildreth had been stabbed before that information was made public. *Id.* at 49.

Berryman's lawyer, Charles Soria, argued that the government's timeline did not add up and that Berryman could not possibly have been present to commit the crime. Although he argued at length that the prosecution had charged the wrong person, Soria briefly argued in the alternative that Berryman might have lost his temper after consensual sex and was guilty only of voluntary manslaughter.

## B. Penalty Phase

After the jury's guilty verdict, the State offered additional aggravating evidence at the penalty phase. The jury heard that Berryman had previously been convicted of marijuana transportation and grand theft. *Id.* at 50. Two other witnesses testified to uncharged misconduct. One witness had been in a fight with Berryman in which he alleged that Berryman struck him with a tire iron. *Id.* The other witness, Berryman's father-in-law, recounted a scuffle during which Berryman hit him on the nose. *Id.*

Berryman's lawyers called twenty-one witnesses in mitigation. Many of the witnesses were friends and relatives, including Berryman's wife, siblings, and mother. Family and friends testified that Berryman was warm and loving and always peaceful with women. *Id.* at 51. The jury heard that Berryman's parents had a bad marriage and that his father was violent with his mother. *Id.* at 50. The witnesses testified that Berryman was not given enough attention and affection as a child. *Id.* The family moved often, and Berryman struggled in school. *Id.* As a teenager, he began to abuse alcohol and, after a work-related injury to the head, he began experiencing disabling headaches. *Id.*

After Berryman got married in 1986, his life improved. He and his wife had a son, and Berryman was an active participant in his father-in-law's church. *Id.* But after he lost his job, he began drinking heavily again, leading to "a precipitous downward spiral." *Id.* He and his wife separated shortly before Hildreth's murder. *Id.* at 50–51.

Two expert witnesses testified about Berryman's mental health and development. Dr. William Pierce, a clinical psychologist, diagnosed Berryman with an "alcohol induced organic disorder." *Id.* at 51. On psychological tests, he saw "consistent signs of organicity"—a term then used to describe psychological disorders with apparent physical origins, such as brain damage. Based on his observations, Dr. Pierce opined that further neurological testing was required to "confirm or disconfirm the presence of an organic mental syndrome." But he explained that he had been unable to administer the necessary tests because the Kern County hospitals would not grant him permission.

Dr. Samuel Benson, a psychiatrist, agreed that Berryman exhibited signs of "organicity." *Id.* He opined that Berryman "does, in fact, suffer from an organic mental

syndrome, that it's probably alcohol induced, but [that] other factors in addition to his consumption of alcohol" also contribute, among them "head trauma." *Id.* He testified that Berryman had sustained head trauma on other occasions, including a work-related fall from a crane or forklift, and once when he was hit with a pipe. Dr. Benson agreed with Dr. Pierce that additional testing was necessary—in particular, an electroencephalogram (EEG). This test would measure Berryman's brain activity to determine whether he was suffering from seizures. Drs. Benson and Pierce testified that these seizures could have caused Berryman to become violent and disoriented and experience blackouts. Dr. Benson would also have administered an alcohol-induced EEG, which looks for seizures specifically brought on by alcohol. He, too, testified that local hospitals refused to allow the tests.

On cross-examination, Dr. Benson agreed that he had no information that Berryman had ever experienced a blackout or a seizure or that Berryman had ever become lost or disoriented. He explained that because he was unable to perform the EEG tests, he did not know whether Berryman had a seizure disorder. He also conceded that, while an individual might be violent during a seizure episode, it would not be possible for him to commit rape.

During closing arguments, the prosecutor criticized the defense for failing to have the EEG tests performed. He offered one possible explanation for that failure: "Because as it stands, they have something to talk about. . . . They don't want that test to be performed because it will rule out [brain damage] and then they wouldn't have anything to talk about." The prosecutor argued that even if there had been tests showing brain damage, they would not have made a

difference. The experts' hypothesis, he argued, did not fit the rape-murder facts of the case.

The jury returned a sentence of death. *Id.* at 47.

C.  Postconviction Proceedings

In state habeas proceedings, Berryman's new counsel presented additional mitigating evidence about Berryman's early life. This evidence included declarations from Berryman's mother and sister, who offered more details about Berryman's childhood and stated that they would have provided this information at the penalty phase if they had been asked or adequately prepared.

Berryman's lawyers also offered new evidence about trial counsel Soria's failure to obtain the scientific tests his experts had requested. Dr. Pierce stated in a declaration that he had told Soria that "further neurological testing was required to determine whether Mr. Berryman suffered from organic brain damage." Dr. Pierce suggested several tests, including an EEG and alcohol-induced EEG. He "told Mr. Soria that if further testing confirmed the existence of brain damage, this information should be used in the guilt part of the trial in addition to the penalty part of the trial."

Dr. Benson agreed that confirmation of his diagnosis required further testing—specifically, an EEG, an alcohol-induced EEG, and a Positron Emission Tomography (PET) scan. He explained that after learning the local hospitals would not perform the tests, he suggested to Soria that they have the tests performed in a different part of the State. Soria, however, told him that the court would not authorize such expensive tests to be performed outside of Kern County. Without the testing, Dr. Benson was unable to conclude with certainty that Berryman had brain damage.

Like Dr. Pierce, Dr. Benson told Soria that his testimony, especially if confirmed by testing, could be used at the guilt phase to diminish Berryman's "culpability for the killing."

Soria explained in his own declaration that he never requested a transfer order to take Berryman out of Kern County for testing. This was because he "believed at the time the court would not issue such an order." In a case two years after Berryman's, however, Soria successfully obtained transfer orders from the same trial judge to get an out-of-county EEG and PET scan for another client. Soria conceded there was "no reason why a similar order would not have issued in [Berryman's] case" had Soria sought one.

Berryman's postconviction counsel asserted ineffective assistance of counsel claims, both on direct appeal and in a state habeas petition. Berryman's conviction and sentence were affirmed on direct appeal in a reasoned opinion by the California Supreme Court. *See Berryman*, 864 P.2d at 48. The same day, the California Supreme Court summarily denied his habeas petition on the merits.

Berryman filed a federal petition for a writ of habeas corpus asserting numerous claims of error, all of which the district court denied. The district court granted a certificate of appealability (COA) as to Claim 65, Berryman's allegation of penalty-phase ineffective assistance of counsel for failure to present additional evidence of his family history and social background. On appeal, Berryman presses that issue and requests that we expand the COA to encompass fourteen other claims. We expand the COA to include four additional claims, discussed below, but otherwise deny Berryman's request. *See Hedlund v. Ryan*, 854 F.3d 557, 565 (9th Cir. 2017).

## II.  Discussion

Because the California Supreme Court rejected each of the claims at issue here on the merits, the Antiterrorism and Effective Death Penalty Act of 1996 applies.  *See* 28 U.S.C. § 2254(d).  The parties disagree whether the relevant decision is the California Supreme Court's opinion on direct appeal, as Berryman asserts, or its summary denial of his state habeas petition, as the State contends.  We need not resolve that dispute because, even accepting Berryman's argument, he still cannot prevail on any of his claims.

Under § 2254(d), we must defer to a state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  For ineffective assistance of counsel claims, the clearly established federal law is *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed, Berryman must show that his counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

We may grant Berryman habeas relief only if the California Supreme Court's application of *Strickland* was "objectively unreasonable."  *Williams v. Filson*, 908 F.3d 546, 563 (9th Cir. 2018) (internal quotation marks omitted).  That means we may issue the writ only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

A. Claim 65

Berryman alleges that he was denied his Sixth Amendment right to counsel at the penalty phase because his lawyers failed to present additional evidence of his family history and social background. The California Supreme Court held that Berryman failed to show that he was prejudiced by any deficiency in his counsel's performance. The state court concluded that Berryman did not "establish ineffective assistance in defense counsel's asserted failure to further investigate his background and character . . . . He [did] not demonstrate that such further investigatory efforts would have yielded favorable results. Hence, he cannot demonstrate that their omission adversely affected the outcome within a reasonable probability." *Berryman*, 864 P.2d at 78.

Fairminded jurists could conclude that the California Supreme Court's application of *Strickland* was correct. Nearly all of the "new" evidence that Berryman argues the jury should have heard was not new at all. The rest of the evidence, a fairminded jurist could conclude, would not have been sufficient to make a different result reasonably probable.

We begin with a discussion of the "new" evidence that was cumulative of evidence the jury previously heard. First, Berryman argues that his lawyers should have presented evidence that Berryman's mother "showed him little love and affection during his early formative years." But during the penalty phase the jury heard evidence concerning the emotional deficits in Berryman's relationship with his mother. Witnesses testified that his mother was largely absent, that her children did not get "the attention that [they] should have," and that Berryman was left with "a hole in the

bucket around mothering and nurturance" that continued to affect his relationship with women in adulthood.

Second, Berryman maintains that his lawyers should have presented evidence concerning his turbulent childhood. But the jury heard that Berryman's family moved often; that his father drank heavily; that Berryman developed problems with alcohol; and that he was devastated by his father's death and, for some period of time, refused to accept that his father had died.

Third, Berryman faults his lawyers for not presenting evidence that his father beat his mother in front of him and his siblings, including an incident in which his mother escaped by running into the street and was nearly hit by a car. Although Berryman's mother did not provide the specifics of any particular incident, she did testify during the penalty phase that Berryman's father was violent toward her.

Finally, Berryman contends that his lawyers should have introduced evidence that he did poorly in school, was frequently placed in special education classes, and in the third grade had an IQ score of 75, which is in the borderline intellectually disabled range. But the jury heard repeatedly during trial that Berryman had a learning disability and intellectual deficiencies, and that he did poorly in school and was placed in specialized classes.

Berryman's habeas petition does offer some new evidence that was not presented at trial. The jury did not hear that he was born prematurely, that he spent the first month of his life in an incubator, or that his father was a

womanizer.[1]   This new evidence, we will assume, should have been discovered and presented to the jury.  And we will assume that Berryman's lawyers should have presented some of the additional details not fully captured above, such as the details concerning his low IQ score and his father's abuse of his mother.  Nonetheless, even if this evidence had been presented to the jury, it would not have significantly altered the character of the evidence supporting mitigation.  Reasonable jurists could therefore conclude that admission of this evidence would not have led to a reasonable probability of a different sentence.  *See Cullen v. Pinholster*, 563 U.S. 170, 200–02 (2011) (affirming a state court's finding of no prejudice notwithstanding new mitigation evidence of roughly the same strength as that presented here).

## B.  Claims 15 and 16

Berryman requests that we expand the COA to encompass Claims 15 and 16.  Claim 15 alleges that Berryman's trial lawyers were ineffective in failing to present expert psychological and psychiatric testimony at the guilt phase to support his argument that the killing was not premeditated or intentional.  Claim 16 alleges that his trial lawyers were further ineffective in failing to seek out and develop social history evidence and additional expert testimony to establish Berryman's brain disease and mental state for use at the guilt phase.  We conclude that "jurists of reason could disagree" with the district court's denial of

---

[1] Berryman also presents affidavits from his mother and sister, both of whom state that he told them after his arrest that he was molested by two of his uncles when he was about eight years old.  This evidence, however, is inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802–805.  The district court therefore did not consider it, and neither do we.  *See* Fed. R. Evid. 1101(a)–(b).

these claims, and therefore expand the COA to cover them. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see* 28 U.S.C. § 2253(c)(2). Ultimately, though, we agree with the district court that the claims must be denied.

In rejecting these closely related claims, the California Supreme Court concluded:

> Neither does defendant establish ineffective assistance in defense counsel's asserted failure to investigate his mental state at the time of the crime or to introduce evidence thereon. Here as well, he does not demonstrate that the investigation would have yielded favorable results and hence cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.

*Berryman*, 864 P.2d at 61 (footnote omitted). In other words, the state court determined that Berryman was not prejudiced by counsel's failure to seek out or present mens rea evidence at the guilt phase. That decision was reasonable.

Berryman argues that his lawyers should have presented expert testimony supporting the theory that, although he killed Hildreth, he did so without premeditating or forming the specific intent to kill. In support, he points to Dr. Pierce's and Dr. Benson's testimony at the penalty phase, in which they offered their diagnosis of possible organic brain syndrome, as well as both doctors' affidavits on state habeas review, in which they stated that they told Soria their findings could be helpful at the guilt phase of trial.

Trial counsel's failure to present this evidence could have prejudiced Berryman only if the argument it supported had the potential to sway a jury. But presenting this evidence during the guilt phase would have required admitting to the jury that Berryman was present at the scene, had sex with Hildreth, and delivered the fatal cut to her neck. And because the expert testimony was that it would have been impossible for Berryman to have had sex during a seizure, his counsel would have been forced to argue that he and Hildreth engaged in consensual sex and that he had the seizure only afterward. It is reasonable to assume that this argument would likely have been greeted with extreme skepticism. The fact that Hildreth was found left on a dirt road with her clothes in disarray and a shoe imprint on her face would have made it seem frivolous to argue that her killing had occurred during a seizure, or was otherwise the product of unintentional conduct. The evidence was inconsistent with the shoeprint on her face being inflicted in a momentary outburst or by accident. *Berryman*, 864 P.2d at 49 (estimating the mark took "more than one minute and perhaps as long as three to five" to make).[2]

The difficulty of persuading a jury of this theory would have been compounded by the lack of any case-specific evidence in support of it. Although his experts could have opined that it was possible for Berryman to have had a seizure and a fit of violence after consensual sex, Berryman does not suggest that he would have taken the stand to testify that that is what happened. Nor is there any physical evidence to back up the account. Berryman argues that "the absence of vaginal trauma and the victim's shoe being off

---

[2] The fact that Soria briefly posited the possibility of an unintentional killing as an alternative argument did not mean that he should have pursued it more vigorously.

established there was no rape, (i.e., the assault occurred after consensual intercourse, the disarranged clothing being equally consistent with hurried voluntary sexual interaction as with rape)."   But the absence of vaginal trauma "establishes" nothing of the kind, especially considering that Hildreth had pelvic abrasions and a knife wound in her neck, suggesting that the knife may have been held to her throat. Whether or not the state of her shoes and clothing was "equally consistent" with rape and consensual sex, it did nothing to *support* the theory that Berryman killed her unintentionally or without premeditation.

By adopting this far-fetched theory, Berryman's lawyers would have lost the ability to argue the more straightforward theory that the police had arrested the wrong person.  The circumstantial evidence tying Berryman to the scene was not insurmountable.  The strongest piece of evidence was the drop of blood on Berryman's shoe, consistent with only 1 in 1,470 unrelated African-Americans.  *Berryman*, 864 P.2d at 49.  But Berryman had a ready reply:  The blood could have come from any of Hildreth's relatives, with whom he frequently had contact.  As for the fingerprint in his truck, his lawyers also had a response prepared:  Even though Hildreth had never ridden in his truck, she still could have left a print by leaning against the car while talking.  The straightforward innocence argument that Berryman's lawyers pursued was not a lost cause.

The California Supreme Court reasonably concluded that a mens rea defense theory would not have been reasonably probable to persuade the jury to acquit.  *See* 28 U.S.C. § 2254(d)(1).  Even if we assume that counsel rendered deficient performance in failing to conduct further investigation, it was eminently reasonable for the court to conclude that Berryman failed to show that the omission of

this argument adversely affected the outcome, as counsel was more likely to succeed in arguing that Berryman had not killed Hildreth at all.

C.  Claims 63 and 64

Berryman also requests that we expand the COA to encompass Claims 63 and 64, which together assert that his lawyer was ineffective at both the guilt and penalty phases for failing to obtain the trial court's transport order and funding authorization for the EEG tests and PET scan. Berryman argues the tests "were necessary to support the defense experts' conclusion" that he had brain damage, including a possible seizure disorder.  We again conclude that "jurists of reason could disagree" with the district court's denial of these claims, and therefore expand the COA to encompass them.  *Miller-El*, 537 U.S. at 327; 28 U.S.C. § 2253(c)(2).

In denying relief as to Claims 63 and 64, the California Supreme Court stated as follows:

> [D]efendant does not establish ineffective assistance in defense counsel's asserted failure to pursue neurological testing to determine whether and to what extent he suffered from an organic mental syndrome or disorder.  He does not demonstrate that such testing would have yielded favorable results. Hence, he cannot demonstrate that its omission adversely affected the outcome within a reasonable probability.

*Berryman*, 864 P.2d at 78.  As Berryman reads this decision, the California Supreme Court denied his claim because he could not show what the results of the various tests would

have been.   And because the state court had denied his requests for funding to have those tests performed, he argues that he was left in an "unreasonable catch-22," penalized for not knowing what the state court would not let him find out.

Although we agree with Berryman that a ruling on the circular ground he describes would have been unfair, the state court's use of the words "favorable results" is best understood more broadly.   In the guilt-phase context, we read the California Supreme Court's reference to "favorable results" to mean test results that could help convince a juror to acquit.   And in the penalty-phase context, we read "favorable results" to mean test results that could help convince a juror to vote for life—that is, results whose absence could have "affected the outcome within a reasonable probability."   *Id*.

The California Supreme Court's conclusion that the tests lacked the capacity to produce results that might have moved a juror to vote to acquit (or to vote for life in prison) was reasonable.  *See* 28 U.S.C. § 2254(d)(1).  Berryman had been convicted of the rape and murder of a teenage girl.  In the best-case scenario, the tests his experts wanted to conduct would have confirmed their diagnosis that he had brain damage.  (The jury did hear Berryman's experts opine that he suffered from organic brain disease.)  This argument hinges on Berryman's assumption that the tests could have confirmed that he had a seizure disorder, and that those seizures could have caused him to become violent.  Even assuming the efficacy and admissibility of the testing, the tests were not capable of showing that Berryman had actually experienced seizures at any time in the past, much less that he was having a seizure when he killed Florence Hildreth.  *See Pizzuto v. Arave*, 280 F.3d 949, 964 (9th Cir. 2002), *as amended*, 385 F.3d 1247 (9th Cir. 2004).

What's more, as Dr. Benson acknowledged, it would not have been possible for Berryman to commit rape if he were having a seizure. This theory therefore would have required a jury to believe that Berryman first engaged in sex with Hildreth and then had a seizure that caused him to lose control and kill her. The evidence showed, however, that she was killed by a relatively shallow cut, not by "thrashing out" or other especially violent activity that Dr. Benson described as possible in the course of a seizure. *Berryman*, 864 P.2d at 49. As discussed above with respect to Claims 15 and 16, Berryman's lawyers would likely have had great difficulty persuading the jury to accept this version of events, no matter what the test results showed. It was reasonable for the California Supreme Court to conclude that Berryman suffered no prejudice from his defense counsel's failure to seek out these tests and press this argument, either at the guilt phase or during the penalty phase.

As for the argument that obtaining conclusive proof of Berryman's alleged brain injuries might have persuaded the jury to show Berryman more leniency in sentencing, Berryman's lawyers would have faced similar challenges. The fact remains that neither Berryman nor anyone else reported that he had ever suffered a seizure, a blackout, or disorientation. And while brain damage could have manifested itself in other ways, the jury was already well acquainted with Berryman's trouble in school, alcohol abuse, head trauma, and other difficulties. Jurors knew that he had areas of relative strength: He had married, held jobs, and had a year-long period of stability in which he functioned as a good father, good husband, and dedicated member of his church. The state court reasonably concluded that, even if testing could have made the expert diagnoses invulnerable to attack by the prosecution, the fact of brain damage without further evidence of actual manifestations or

identifiable impact on Berryman's life was not reasonably likely to have made a difference in the jury's sentence.

Claims 63 and 64 are further undermined by the neurological testing that Berryman eventually obtained in 2001. In the course of his federal habeas proceeding, the district court granted permission for Berryman to receive the specialized neurological testing that Drs. Pierce and Benson requested. The 2001 test results confirm our conclusion that the California Supreme Court did not unreasonably determine that Berryman was not prejudiced by the omission of these tests at trial. First, it is unclear whether the test results would have been admissible under the then-prevailing standard for scientific evidence. In its opposition to the request for this testing in the district court, the government strenuously argued that the tests were not generally accepted in the scientific community for the purposes that Berryman's experts advocated. The government argued the tests should not be performed for that reason. In its order denying Berryman's habeas petition, the district court acknowledged the controversy regarding the admissibility of the tests and did not decide whether the test results would have met the standard for admissibility.

Second, even if the neurological test results would have been admissible, Berryman cannot establish a reasonable probability that they would have changed the outcome. Berryman's experts stated that the test results reinforced their penalty-phase testimony that Berryman had an organic brain disorder, but the state's experts strongly disagreed with their interpretation. Dr. Waxman stated that the PET scan results did not indicate temporal lobe epilepsy and went on to suggest that Berryman's expert had presented an interpretation designed to "mislead the reader." Dr. Nuwer stated that the EEG tests indicated "normal EEG brainwaves

as seen in someone who is intoxicated and drowsy." The disputed results from these neurological tests reinforce our conclusion that Berryman was not prejudiced by his counsel's failure to authorize these tests during the guilt or penalty phase.

\*　　\*　　\*

We therefore affirm the district court's denial of Berryman's habeas petition as to each of his claims. Berryman's requests for judicial notice (Dkt. Nos. 190, 256) are GRANTED.

**AFFIRMED.**